PAUL A. BONIN, Judge.
b Mrs. Iron, the mother and domiciliary parent of Alex Iron, filed in 2010 a petition to set child support against Mr. Iron, her former husband and the father of Alex.[1] At the close of the rule, the trial judge in 2014 cast Mr. Iron in judgment for child support. In setting the support amount due for two of the intervening calendar years, the trial judge concluded that the father, a Baton Rouge-area attorney with fifteen years of practice, had been voluntarily underemployed during that time and then calculated his gross income for those two years by use of the Louisiana Occupational Employment Wage Survey. The trial judge also concluded as a component of the child support obligation owed by the father that because the best interests of the child dictated that Alex attend private *250 high school in New Orleans, Mr. Iron was additionally responsible for his pro rata share of the expenses of his child’s education.
On appeal, Mr. Iron complains that the trial judge was clearly wrong in finding him voluntarily underemployed and, on a related issue, that the trial judge [ ¡.abused her discretion in excluding the testimony of his proposed expert witness, Louis Li-pinski, a rehabilitation counselor, regarding the trial judge’s use of the Louisiana Occupational Employment Wage Survey. The father also complains about the trial judge’s finding that the best interests of the child required that Alex attend the particular private school in New Orleans and, more importantly for .his purposes, that he be required to pay his proportionate share of the child’s educational expenses.
We have reviewed the finding that the father was voluntarily underemployed for two years under the manifest error standard of review and, based upon the evidence admitted at trial, conclude that the trial judge’s finding was not clearly wrong and was reasonable. We have also reviewed her ruling excluding the testimony of Mr. Lipinski but under an abuse-of-discretion standard and conclude that she did not abuse her discretion in excluding his proffered testimony. Finally, we have reviewed under an abuse-of-discretion standard her finding regarding the best interests of the child being served in a private school and conclude that there was no abuse in that discretionary finding.
Accordingly, we affirm the trial court’s June 23, 2014 judgment and explain our decision in more detail below.
I
A
The parties were married on July 22, 1995, and Alex, the only child of this marriage, was born later that year. The wife subsequently filed a petition for | ¡¡divorce on April 24, 1998. Acting oh her petition, a judge of the Family Court for the Parish of East Baton Rouge signed a judgment of divorce on June 25, 1998, which dissolved the marriage, awarded joint custody of Alex to both parties, and designated Mrs. Iron as the domiciliary parent. Mrs. Iron did not initially petition the court for an award of child support because at that time Mr. Iron was voluntarily paying her monthly child support.[2]
Subsequent to the judgment of divorce, both Mrs. Iron and Mr. Iron remarried.[3] Mr. Iron remained in the Baton Rouge area while Mrs. Iron moved to the New Orleans area. Alex lived primarily with Mrs. Iron and her new husband in New Orleans although the child visited Mr. Iron frequently.
On December 15, 2010, Mrs. Iron filed her petition to make executory the June 25, 1998 judgment of divorce and initial request to set child support. The trial court made executory the divorce decree and set a hearing on Mrs. Iron’s rule to set child support. The rule did not come to trial on the initial setting because of discovery disputes. Further, Mr. Iron re *251 sponded to Mrs. Iron’s petition with an exception of improper venue. The trial court granted the exception and ordered that the matter be transferred to East Baton Rouge Parish. Mrs. Iron appealed to this Court, and we, applying La. C.C.P. art. 74.2, reversed the trial court’s ruling. See A.S. v. D.S., 11-1030 (La.App. 4 Cir. 8/16/11), unpub. Mr. Iron then unsuccessfully sought writs with the Supreme Court.[4]
After we remanded this matter to the trial court, the parties engaged in further discovery and motion practice. Mrs. Iron’s rule to set child support re-set several times, coming finally to trial on May 8, 2014. By this point, Alex was eighteen, on the verge of graduating from high school, and was planning to attend a community college.
B
Three issues dominated the trial on the child-support rule: 1) whether Mr. Iron was voluntarily underemployed; 2) if so, what amount of annual income should the trial court impute to Mr. Iron; and, 3) whether Mr. Iron should be compelled to pay for his pro rata share of Alex’s private high school education. At trial, both parties testified in support of their relative positions. Mr. Iron introduced exhibits reflecting his wealth, income, and other support and household obligations. Mr. Iron also attempted unsuccessfully to introduce the expert testimony of Louis Li-pinski, a certified rehabilitation counselor, in order to convince the trial court that, in the event she found that he was voluntarily underemployed, she should not use the Louisiana Occupational Employment Wage Survey as a means to set Mr. Iron’s income for 2011 and 2012. Mrs. |5Iron presented the testimony of Dr. Sands in support of her request to have Mr. Iron compelled to pay his pro rata share of Alex’s high school costs. In opposition, Mr. Iron presented the testimony of Cheri Marocco, a special education coordinator and teacher, associated with Alex’s primary and middle schools.
At the close of the hearing, the trial court ruled from the bench, set Mr. Iron’s support obligations, and gave extensive reasons in support. She subsequently signed a written judgment on June 27, 2014. Specifically, the trial court cast Mr. Iron in judgment for a monthly basic child support obligation. The trial court ruled that Mr. Iron’s support obligation was $531.39 per month for 2010[5], $649.65 per month for 2011, $613.55 per month for 2012, and $924.39 per month for 2013 forward. In setting the amount of his monthly obligations, the trial court also concluded that Mr. Iron was voluntarily underemployed for the years 2011 and 2012. In accordance with this finding, the trial court relied upon the Louisiana Occupational Employment Wage Survey, as provided by La. R.S. 9:315.11, and ascribed a yearly gross income to Mr. Iron of $58,843 for 2011 and 2012.[6] The trial court also concluded that attending private school was in the best interests of Alex and ordered Mr. Iron, in accordance with La. R.S. 9:315.6, to pay his pro rata share of the expenses in addition to the monthly basic child support obligation.[7]
*252 |fiMr. Iron filed a timely motion to appeal on July 22, 2014. We now turn to consider the three issues which Mr. Iron raises on appeal.
II
In this Part, we examine Mr. Iron’s assertion that the trial judge erred when she concluded that he was voluntarily underemployed in 2011 and 2012. Our manifest error review of the ruling indicates that in setting Mr. Iron’s basic support obligation the trial judge adhered to the controlling guidelines contained within Title 9 and was reasonable in her ruling.
A
With respect to the child support provisions in Title 9, the Legislature indicates that the “premise of these guidelines as well as the provisions of the Civil Code is that child support is a continuous obligation of both parents, children are entitled to share in the current income of both parents, and children should not be the economic victims of divorce or out-of-wedlock birth.” La. R.S. 9:315 A. In promulgating Title 9’s guidelines, the legislature also acknowledges that while “the expenditures of two-household divorced, separated, or non-formed families are different from intact family households, it is. very important that the children of this state not be forced to live in poverty because of family disruption and that they be afforded the same opportunities available to children in intact families, consisting of parents with similar financial means to those of their own parents.”
| ./Accordingly, Title 9’s “guidelines are to be used in any proceeding to establish or modify child support filed on or after October 1, 1989.” La. R.S.9:315.1 A. Title 9 also provides that there “shall be a rebut-table presumption that the amount of child support- obtained by use of the guidelines set forth in this Part is the proper amount of child support.” Id. In order to aid a trial court in setting a support obligation Title 9 indicates that each “party shall provide to the court a verified income statement showing gross income and adjusted gross income, together with documentation of current and past earnings.” La. R.S. 9:315.2 A. Title 9 defines income as the actual “gross income of a party, if the party is employed to full capacity;” or the potential income of a party, “if the party is voluntarily unemployed or underemployed.” La. R.S. 9:315 C(5).
This Section further notes that a “party shall not be deemed voluntarily unemployed or underemployed if he or she is absolutely unemployable of being employed, or if the unemployment or underemployment results through no fault or neglect of the party.” La. R.S. 9:315 C(5). Section 315.2 B of Title 9 further notes that if “a party is voluntarily unemployed or underemployed, his or her gross income shall be determined as set forth in R.S. 9:315.11.”
Section 9:315.11 A provides that if “a party is voluntarily unemployed or underemployed, child support shall be calculated *253 based on a determination of income earning potential, unless the party is physically or mentally incapacitated, or is caring for a child of the parties under the age of five years.” La. R.S. 9:315.11 A. If a trial court concludes that a party is voluntarily unemployed or ^underemployed, it may “consider the most recently published Louisiana Occupational Employment Wage Survey” in determining the party’s income earning potential.[8] Id.
Whether a party is voluntarily underemployed with respect to calculating child support is a question of good faith of the party to be cast with paying the child support obligation. See Anderson v. Anderson, 11-864, p. 5 (La.App. 5 Cir. 5/31/12); 96 So.3d 1278, 1281.
B
Voluntary underemployment is a fact-driven consideration. See Langley v. Langley, 07-0754, p. 4 (La.App. 4 Cir. 3/26/08), 982 So.2d 881, 884. The trial court has wide discretion in determining the credibility of witnesses. See Robeaux v. Robeaux, 13-0404, p. 10 (La.App. 4 Cir. 11/6/13); 129 So.3d 659, 667. The trial court’s conclusion that Mr. Iron was voluntarily underemployed is, therefore, a factual finding governed by the manifest error-elearly wrong standard of review. See Langley, 07-0754, p. 4, 982 So.2d at 884. In civil cases, we apply the manifest error standard of review to the trier of fact’s factual findings. See Hall v. Folger Coffee Co., 03-1734, p. 9 (La.4/14/04), 874 So.2d 90, 98. In order to reverse the findings of a trier of fact, “ ‘an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding .of the trier of fact; and (2) the court must further determine the | ^record establishes the finding is clearly wrong.’ ” Harold A. Asher, CPA, LLC v. Haik, 12-0771, p. 4 (La.App. 4 Cir. 4/10/13), 116 So.3d 720, 723-724, quoting S.J. v. Lafayette Parish School Board, 09-2195, p. 12 (La.7/6/10), 41 So.3d 1119, 1127.
 The issue for a reviewing court to resolve when faced with a finding of fact “is not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one.” Stobart v. State through Dept, of Transp. and Development, 617 So.2d 880, 882 (La.1993). Thus, even when we may consider that our “own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony.” Id. (citations omitted). This particular standard of review is based, in part, on the trial court’s ability to better evaluate the testimony of live witnesses, compared with an appellate court’s sole reliance upon a written record. In addition, the standard is based on “ ‘the proper allocation of trial and appellate functions between the respective courts.’ ” Stobart, 617 So.2d at 883, quoting Canter v. Koehring Co., 283 So.2d 716 (La.1973), superceded by statute on other grounds as noted in Walls v. Am. Optical Corp., 98-0455 (La.9/8/99), 740 So.2d 1262, 1265.
Consequently, when there are two permissible views of the evidence, the trier of fact’s choice between them cannot be manifestly erroneous. See Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). As pointed out in Lasyone v. Kansas City *254 Southern R.R., 00-2628, p. 6 (La.4/3/01), 786 So.2d 682, 688-689, “[t]hese | ^standards for manifest error review are not new. They are the guiding principles that aid our courts of appeal, which are our error correcting courts, when reviewing a trial court’s factual determinations.” The manifest error standard of review also applies to mixed questions of law and fact. See Brasseaux v. Town of Mamou, 99-1584, pp. 7-8 (La.1/19/00), 752 So.2d 815, 820-821.
C
In response to Mrs. Iron’s claim that he was voluntarily underemployed in 2011 and 2012, Mr. Iron testified about his work and earning history as well as his attempts to secure additional income during the two years in question. Mr. Iron testified that he has an undergraduate degree in criminal justice and that while in college he worked as a bartender.[9] After graduating from law school in the middle of his class, Mr. Iron was admitted to the bar in 1999. He testified that he first worked in Lafayette, Louisiana, making $35,000.00 per year. Mr. Iron later moved to Baton Rouge where he had a criminal defense practice. In 2005 Mr. Iron took a job as an escrow attorney. Mr. Iron claimed that he later lost this job in 2007 as a result of a downturn in the housing market, although he offered no evidence to support this assertion. Mr. Iron testified that he then restarted his criminal law practice while at the same time he began to search for work. As for his actual income, Mr. Iron testified that in 2010 he earned $43,494.00, while in 2011 he earned $24,696.00, and in 2012 he earned $15,395. Eventually, Mr. Iron took a Injob with a real estate title company in 2013 and his income rose to nearly $100,000.00 per year.
In regards to his efforts to find better employment, Mr. Iron stated that he applied unsuccessfully for approximately twenty-eight jobs with the State of Louisiana through its online job application website, although he failed to detail the salaries associated with these jobs. Mr. Iron testified that he also applied for approximately thirty to forty jobs with private firms during this time. Although he failed to state whether he was offered a position, he noted: “they all want to start you off at like $40,000 or $35,000 and just grind you to death. They want someone fresh out of law school. They don’t want someone that’s been out for eight to nine years.” He also tried to find work through networking: “I was in court a lot in criminal court so I would always ask everybody if they knew of-anybody that was hiring. I told them that I would start at the bottom and work my way up. I asked a lot of people.” Mr. Iron also introduced a printed report from the State’s job' application website listing the number of applications he applied for as well as cursory printed entries from his computer’s calendar program, in an attempt to detail the amount of time he spent representing clients and in job searching. Mr. Iron, nevertheless, failed to substantiate his claims with actual job applications, correspondence, or time entries. In characterizing his efforts, Mr. Iron testified that he went “above and beyond” what would constitute a good faith job search effort.
I12D
The trial judge, in concluding that Mr. Iron was voluntarily underemployed for the years 2011 and 2012, stated that while she found him “credible for the most part,” she nevertheless did not find credible his assertion that he did all that he could to find work:
*255 I don’t believe — very honestly that’s the part of the testimony that I’m not believing. I think he was credible for the most part and that’s just the part I’m not believing. I don’t believe that he put forth every effort that he could have to do whatever it takes to turn over every stone to find employment and not just apply with the Civil Service Commission. As a result I am imputing income at $58,843 which is the lowest end of the wage survey.
The trial judge noted that the amount imputed for 2011 and 2012 represents a Baton Rouge area attorney’s salary at the lower end of the spectrum as reflected by the Louisiana Occupational Employment Wage Survey. Specifically, the trial judge observed that with respect to Louisiana attorneys, the 75th percentile reflects a salary of $110,000, the 50th percentile reflects a salary of $76,000, while the 25th percentile reflects a salary of $58,848.
On the basis of the evidence admitted by the trial judge, we cannot say that the trial judge was clearly wrong or unreasonable in her conclusion that Mr. Iron was voluntarily underemployed in 2011 and 2012. While Mr. Iron made some attempt to find work during the years in question, evidence in the record supports the trial judge’s observation that he did not put forth a vigorous effort.
Indeed, evidence in the record suggests that Mr. Iron’s efforts were not motivated by a great sense of urgency. For example, Mr. Iron testified that he and |iahis current wife’s financial relationship is regulated by a separate property agreement. He noted that, although his wife no longer works, the agreement was devised to protect his wife’s family’s businesses: “Everything — me and my wife have a separate property agreement and all the financial stuff is I have zero access to it, so I’m not sure because they have a couple of different businesses.”
Mr. Iron also testified that his father-in-law helped him out by loaning him an unspecified sum of money and purchasing for $1,200,000.00 the lot on which their home now sits. Mr. Iron also testified that the house subsequently built on the property is owned by his wife. He did not know, however, how much it cost to construct the home, if his wife took out a loan to construct the home, or, if there even is a house note. Mr. Iron did state that his wife pays the property taxes on the house as well as the homeowner’s insurance. Mr. Iron’s wife, likewise, pays for his medical insurance. Mr. Iron testified that while he reimburses his wife for the electric, gas, and water utility costs[10], his wife is responsible for the actual payment of all household bills, such as their maid service. He also explained that he uses an American Express card, which is linked to his wife’s American Express account, to pay for all his non-work related expenses and then reimburses her for the amount at the end of each month.
The trial judge’s conclusion on voluntary underemployment is not unreasonable, especially in light of the fact that Mr. Iron’s own lifestyle, or standard of living, was hardly diminished by his relatively paltry personal income | ^considering his education and experience. And from that circumstance one might readily infer that maximizing his earning potential was not a priority for him. In light of the evidence introduced at trial, we therefore conclude that the trial judge did not err in concluding that Mr. Iron was voluntarily underemployed for the years 2011 and 2012.
*256 III
In this Part, we address Mr. Iron’s contention that the trial judge erred when she refused to accept Louis Lipinski as an expert witness. We here observe that Mr. Iron properly preserved this issue for our review by proffering Mr. Lipinski’s testimony. See La. C.C.P. art. 1636; La. C.E. art. 103 A(2) (error may not be predicated upon a ruling which excludes evidence unless a substantial right of the party is affected and the substance of the evidence was made known to the court by counsel). Cf. Hightower v. Schwartz, 14-0431, p. 9 (La.App. 4 Cir. 10/15/14); 151 So.3d 903, 907 (we “will not consider an assignment of error which complains about the exclusion of testimony or other evidence when the party failed to make its proffer or offer of proof.”).
A
Mr. Iron’s counsel initially offered Mr. Lipinski as an expert in the field of “wage surveys and for the purposes of looking at the wages that [Mr. Iron] is reporting here to the court in his field within the changes he has experienced in his job.” In his voir dire examination, however, Mr. Lipinski testified that he works as a vocational rehabilitation counselor and had been qualified as such by numerous [ 1fiLouisiana state and federal courts. He, nevertheless, failed to provide any details as to which courts had accepted his qualifications and when this acceptance occurred. He also stated that while he had used wage surveys in connection with his work, he was unfamiliar with the Louisiana Occupational Employment Wage Survey. He likewise testified that he had never before published a wage survey.
Counsel for Mrs. Iron objected to the offer of Mr. Lipinski as an expert on the production of wage surveys. The trial judge sustained the objection, and noted that Mr. Lipinski, as a vocational rehabilitation counselor, was not qualified to discredit or explain why the Louisiana Occupational Employment Wage Survey should not be used in this case. She explained that while a vocational rehabilitation counselor could testify as to the range of jobs available to Mr. Iron at a given time, he could not testify about how economic conditions impacted Mr. Iron’s ability to find work and explained her ruling accordingly:
He can’t interpret the wage survey in that manner. That’s beyond his scope of expertise as a vocational rehab counselor. You would have needed to have an economist to tell me this is what he qualifies — he can tell me what he qualifies for because he has no physical limitations or he has physical limitations. He has no mental limitations or he has mental limitations and this is the only things he can do, but you need an economist here to say despite the fact that he may be qualified for this long range of jobs in accordance with the vocational rehab counselor’s testimony, this is the way the markets and this prevented him from getting this, that or the other ...
The trial judge, nevertheless, gave Mr. Iron the opportunity to establish Mr. Li-pinski’s. expertise in the field of vocational rehabilitation counseling. After further voir dire examination, however, the trial judge refused to accept him as an expert in this field because his curriculum vitae failed to list any of the courts 11fiwhere he had previously been accepted as an expert or catalog any of his publications. When confronted with this deficiency, Mr. Lipin-ski testified that he had another, more detailed, curriculum vitae that he used in Federal court, but noted that he had left this document at his office. The trial court, refusing to continue the matter, refused to accept Mr. Lipinski as an expert vocational rehabilitation counselor.
*257 B
The introduction of expert testimony is governed by Article 702 of the Louisiana Code of Evidence:
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(1) The expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(2) The testimony is based on sufficient facts or data;
(3) The testimony is the product of reliable principles and methods; and
(4) The expert has reliably applied the principles and methods to the facts of the case.
A determination regarding the competency of a witness is “within the discretion of the trial court.... A district court’s decision to qualify an expert will not be overturned absent an abuse of discretion.” Cheairs v. State ex rel. Dept. of Transp. & Dev., 03-0680, p. 6 (La.12/3/03), 861 So.2d 536, 541. See also Evevhardt v. Louisiana Department of Transportation- and Development, 07-0981, p. 15 (La.App. 4 Cir. 2/20/08), 978 So.2d 1036, 1048 (“Whether an expert meets 117the qualifications of an expert witness and the competency of the expert witness to testify in specialized areas is within the sound discretion of the trial court.” Jouve v. State Farm Fire and Cas. Co., 10-1522, p. 6 (La.App. 4 Cir. 8/17/11), 74 So.3d 220, 225 (“A trial court’s decision to qualify an expert will not be overturned absent an abuse of discretion.”).
The abuse-of-discretion standard is highly deferential to the trial judge’s determination under consideration. See LCR-M Limited Partnership v. Jim Hotard Properties, L.L.C., 13-0483, p. 9 (La.App. 4 Cir. 10/9/13), 126 So.3d 668, 675. Nevertheless, a court necessarily abuses its discretion if its ruling is based on an erroneous view of the law. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990) and Doe v. Louisiana Bd. of Ethics, 12-1169, p. 2 (La.App. 4 Cir. 3/13/13), 112 So.3d 339, 341; see also United States v. Taylor, 487 U.S. 326, 336, 108 S.Ct. 2413, 2419, 101 L.Ed.2d 297 (1988) (noting that discretionary choices are not left to a court’s inclination, but to its judgment, which is guided by sound legal principles). An abuse of discretion, however, generally results from a conclusion reached capriciously or in an arbitrary manner. See Tugwell v. Plaquemines Parish Government, 14-0657, p. 5 (La.App. 4 Cir. 11/19/14), 154 So.3d 695, 699. “Arbitrary or capricious” means the absence of a rational basis for the action taken. Id. Having reviewed the record, we discern no abuse of discretion in the trial judge’s ruling.
We accordingly conclude that the trial judge did not err when she refused to accept Mr. Lipinski as an expert witness.
[[Image here]]
In this Part, we explain why we reject Mr. Iron’s argument that the trial judge erred when she ordered him to pay his pro rata share of the costs associated with Alex’s private high school education. Mr. Iron asserts that, despite the testimony from Mrs. Iron and Dr. Mark Sands, Alex’s social and educational difficulties were not so great as to warrant placement in a private, as opposed to public, high school. In making this argument, Mr. Iron points to the testimony of Cheri Mar-occo, the special education coordinator, and notes that there was at least one public high school in New Orleans that *258 could have made accommodations for Alex’s special needs.
A
Section 9:315.6(1) of Title 9 of the Louisiana Revised Statutes provides that by agreement of the parties, or upon order of the court, expenses, of tuition, registration, books, and supply fees required for attending á private school to meet the needs of the child may be added to the basic child support obligation. The needs of the child met by the private school need not be particular educational needs; rather, they may include such needs of the child as the need for stability or continuity in the child’s educational program. See official comment to La. R.S. 9:315.6. Therefore, in the absence of an agreement between the parties, Mrs. Iron was required to present evidence that a private high school education was necessary to meet Alex’s needs. See Short v. Short, 11-3, pp. 14-15 (La.App. 5 Cir. 10/25/11), 77 So.3d 405, 415.
119B
A trial judge’s decision to add private school tuition expenses to the basic child support obligation will not be disturbed, unless it is an abuse of the trial judge’s discretion. See Williams v. Williams, 04-1624, p. 2 (La.App. 4 Cir. 3/16/05), 899 So.2d 628, 630.[11] In making her ruling, the record supports that the trial judge followed the clear provisions of La. R.S. 9:315.6: “I can say with certainty based upon the evidence presented through Dr. Mark Sands that this child needed the environment that [the private high school in question] offered this child.” And we note that the trial judge’s ruling is amply supported by evidence in the record.
•The trial judge relied heavily in her ruling upon testimony given by Mrs. Iron and Dr. Sands. Mrs. Iron testified that Alex attended a few private schools early on, although the bulk of Alex’s primary and middle school years were spent attending public schools in New Orleans. Mrs. Iron noted that Alex’s academic performance in public school was either troubled at worst or proficient at best. She also testified that she was asked to withdraw Alex from several pre-schools and kindergarten programs because of Alex’s behavioral problems. She further noted that Alex passed the LEAP test with only basic proficiency. Mrs. Iron, additionally, testified that Alex was bullied and haL rassed by other children while ■ attending public school. Based on Dr. Sands’ recommendations, Mrs. Iron | ^enrolled the child in a private high school in New Orleans in 2010.[12] She observed that Alex thrived academically in the school and that the bullying ceased. Mrs. Iron also noted that Alex had been accepted into a community college and was planning to attend after graduation.
In 2002,. Alex came under the care of Dr. Sands, the Director of Psychiatry for the Mercy Family Center, because of academic and behavioral concerns, social difficulties, and mood problems. Dr.- Sands subsequently diagnosed Alex with “Attention Deficit Hyperactive Disorder — Combined Type, Developmental Coordination Disorder, Disruptive Behavior Disorder, Learn *259 ing Disorders, and Mixed Receptive-Expressive Language Disorder.” At trial, Dr. Sands characterized Alex’s grouping of disorders as Asperger’s Syndrome, an autism spectrum disorder.
Dr. Sands testified that he recommended the private high school in question to Mrs. Iron because it had a history of working with special needs students, and featured block scheduling. He explained that Alex had difficulty with focusing and that block scheduling, which would only force Alex to take four classes at a time, would afford the adolescent more ability to focus on academics. A report prepared by Dr. Sands in 2010 also noted that the school had a strict conduct policy with no tolerance of harassment/bullying within the school environment. Like Mrs. Iron, Dr. Sands also reported that Alex thrived both academically and socially at the 121 private high school, is graduating, and is experiencing positive feelings of self-worth, making friends, and feeling the potential to succeed academically.
In ruling on Mrs. Iron’s request to make Mr. Iron pay his pro rata share of Alex’s private education, the trial judge held on the record that she was granting the request in light of: 1) Dr. Sands’s testimony concerning Alex’s social and educational deficiencies at the time of enrollment in the private high school; 2) Mrs. Iron’s testimony that Alex was being bullied at the public middle school; 3) Alex’s barely proficient LEAP test score; 4) Dr. Sands’s testimony that the private high school in question offered more academic resources and block scheduling — which would greatly aid a student with Alex’s particular issue; and 5) testimony from both Dr. Sands and Mrs. Iron that Alex’s grades improved greatly, while the social deficiencies diminished, over the course of attending the private high school. The trial judge, likewise, found Ms. Maroeeo to be credible. She noted, however, that while Ms. Maroc-co’s open access high school could accommodate Alex’s special needs, Ms. Marocco was unable to guarantee that Alex would have even been accepted to the particular public school.
Having examined the record in light of the foregoing observations, we are unable to find that the trial judge abused her discretion when she ordered Mr. Iron to pay for his pro rata share of Alex’s private high school education.
C
We note that Mr. Iron, however, argues that the trial judge’s ruling was based upon a legal error, which would necessitate our de novo review of this ^determination. Specifically, Mr. Iron alleges as error the trial judge’s observation that he failed to move for judicial review of Mrs. Iron’s placement of Alex in private high school at the time and her reliance upon Shaw v. Shaw, 30,613, p. 8 (La.App. 2 Cir. 6/24/98), 714 So.2d 906, 910, which held in part that all “major decisions made by the domiciliary parent, which would include the choice of schools, are subject to judicial review upon motion by the non-domiciliary parent. La. R.S. 9:335(B)(3).” Shaw also noted that in “the judicial review, it is presumed that all major decisions made by the domiciliary parent are in the best interest of the child and the burden of proving they are in fact not in the best interest of the child is placed on the non-domiciliary parent who opposes the decision.”
Mr. Iron observes, correctly, that Mrs. Iron’s school choice was not at issue, but rather his obligation for Alex’s educational costs, which is governed by La. R.S. 9:315.6. Nevertheless, we do not believe that the trial judge’s recognition of La. R.S. 9:335 B(3) or Shaw constitutes error or necessitates our de novo review of this issue because, as we have already noted, *260 the trial judge followed the clear provisions of La. R.S. 9:315.6 in ruling on this issue.
DECREE
We affirm the judgment of June 23, 2014.- All costs of the appeal are taxed to the appellant. See La. C.C.P. art. 2164.
AFFIRMED

. Because we are compelled to discuss the child's educational needs, we have elected, out of respect for the child’s privacy and in accord with the Uniform Rules-Courts of Appeal, to use pseudonyms when referring to the parents, who are the parties, and to the child.

. At the time Mrs. Iron filed her petition to set child support in 2010, Mr. Iron was paying, on average, $500.00 per month for Alex’s support.

. Mr. Iron is the father of two other children. He acknowledged the first child and, by virtue of stipulated judgment with the child’s mother, he obligated himself to pay the mother $687.50 per month for child support. Mr. Iron’s third child was born of the marriage with his current wife. Mr. Iron and his current wife entered into a separate property regime prior to their marriage.

. We do not cite to the Supreme Court’s writ denial because the caption contains the parties’ full names. See note 1 ante.

. Because Mrs. Iron filed her petition on December 15, 2010, Mr. Iron’s support obligation for 2010 only encompassed the final seventeen days of that year.

. The parties stipulated at trial that Mr. Iron’s yearly gross income for 2010 was $46,800 and $100,000 per year for 2013 forward.

. Additionally, the trial court ruled on several other matters that are not at issue in this appeal. Specifically, the trial court decreed that: 1) Mr. Iron’s gross income will be re *252 duced by the monthly amount of his preexisting support obligation for his second child; 2) Mrs. Iron’s monthly gross income would be as stipulated to by the parties prior to trial; 3) Mrs. Iron shall maintain Alex's health insurance, with Mr. Iron paying his pro rata share of the premiums in accordance with La. R.S. 9:315.4; 4) Mr. Iron is obligated to pay for a pro rata share of the child's extraordinary medical expenses in accordance with La. R.S. 9:315.5; and 5) Mr. Iron was to be given credit for $2,1,200.00 in voluntary support payments made between the date of demand and May 8, 2014. Further, the trial court denied Mr. Iron’s request for a deviation from the child support guidelines in accordance with La. R.S. 9:315.1.

. La. R.S. 13:3712.1 provides that "whenever a copy of a self-authenticating report from the Louisiana Workforce Commission, or from any state or federal reporting agency, is offered in evidence in any child or spousal support proceeding, it shall be received by the court as prima facie proof of its contents.”

. Mr. Iron allowed his occupational bartend-ing license to lapse after leaving school.

. Mr. Iron estimated that the energy and gas costs for his home average between $300 to $400 each month while his average monthly water bill is $282.00.

. See Part III-B, ante, for a discussion of the abuse-of-discretion standard.

. She did not consult with Mr. Iron before enrolling Alex, but informed him about it after the fact. Although he had, at times in the past, paid for the child’s private school costs, Mr. Iron did not pay for Alex to attend private high school. Mr. Iron, however, did not judicially challenge Mrs. Iron’s decision, which was made as the domiciliary parent. See La. R.S. 9:335 B(3).