" 'The manifest error standard of review also applies to mixed questions of law and fact.' "
Gordon v. Gordon , 16-0008, p. 3 (La. App. 4 Cir. 6/8/16), 195 So.d 687, 689 (quoting A.S. v. D.S. , 14-1098, p. 10 (La. App. 4 Cir. 4/8/15), 165 So.3d 247, 254 ).
The de novo standard of review applies to legal issues. Id.
FAULT
Mr. Thomas contends that the trial court erred by finding that Ms. Thomas was free from fault in the divorce. He asserts that Ms. Thomas abandoned the family home.
Trial courts have the authority to award final periodic support to parties free from fault in a divorce. La. C.C. art. 111. Specifically, in regards to divorcing parties who are also the victims of domestic abuse,
[w]hen a spouse has not been at fault prior to the filing of a petition for divorce and the court determines that party was the victim of domestic abuse committed during the marriage by the other party, that spouse shall be awarded final periodic support or a lump sum award, at the discretion of the court, in accordance with Paragraph C of this Article.
La. C.C. art. 112(B). "Freedom from fault is thus a prerequisite to a former spouse's claim for final periodic spousal support." Schmitt v. Schmitt , 09-0415, p. 3 (La. App. 4 Cir. 12/16/09), 28 So.3d 537, 540. "The claimant spouse has the burden to 'affirmatively prove' his or her freedom from fault." Id. (quoting Wolff v. Wolff , 07-0332, p. 4 (La. App. 3 Cir. 10/3/07), 966 So.2d 1202, 1205 ). "To constitute 'legal fault' which would preclude permanent alimony at divorce, the misconduct must not only be of a serious nature, but must also be an independent contributory or proximate cause of the separation ...." Bowes v. Bowes , 00-1062, p. 4 (La. App. 4 Cir. 8/15/01), 798 So.2d 996, 999 (quoting Mayes v. Mayes , 98-2228 (La. App. 1 Cir. 11/5/99), 743 So.2d 1257, 1259 ).
This Court held that "habitual intemperance or excesses, cruel treatment or outrages, and abandonment" could constitute fault. Schmitt , 09-0415, p. 3, 28 So.3d at 540. "A spouse who petitions for final periodic support need not be totally blameless in the marital discord." Id. "[F]urther, permanent alimony will not be denied to a party if their actions were considered reasonable or a justifiable response to the other spouse's provocative acts." Bowes , 00-1062, p. 4, 798 So.2d at 999.
Ms. Thomas testified that she filed a petition for protection from physical abuse from Mr. Thomas in 2013. She stated that *519 abuse caused the end of the marriage. Ms. Thomas described the night she decided to leave the family home:
And what happened was after a long, long time of financial abuse or emotional abuse, it was just that that night, I tried to go home. And I couldn't even enter our home because he had locked a lock, which he usually never-It has several locks, and one lock, I don't-I haven't had a key to, which he was quite aware of. So I couldn't-That was the reason why I couldn't enter, and so I was locked out.
So I went to my husband's family house because I didn't know where else to go, which is like a block away, and tried several times to get in contact with him. And he did not respond at all for hours.
At one point-And he had our son with him. And so at one point, it was then about 10 o'clock or 10:30. It's such a long time ago, and I'm not quite sure what time it was. I just decided, because it got so late, to just return home. My sister-in-law was there. She also tried to get in contact with him. I constantly tried to get in contact with him just to find out when I can come home.
And so when I finally come home, he was already home. The door-So I was able to enter. Our son was sleeping in our bed. And so I just went in my son's bedroom 'cause I didn't wanted [sic] to sleep in our bed just to get away, out of the confrontation, 'cause before I came home, I had to study.
I'm a licensed tour guide here in New Orleans, and I was studying for that license. And he had already called me several times: why I was with a friend of mine. She is my-She was my tutor, and she tried to prepare me for this license. And he was calling several times, and my sister-in-law was calling several times because he didn't want me to be there.
And he had threatened me already that he wouldn't take care our [sic] son anymore and all kinds of other threats. And so he was mad already. So I tried to get away, out of the confrontation and just went in our bedroom. And then he came in there when I was already laying down, and he tried to-He said-He tried to get my phone, and he tried to snatch my purse, which was standing in one corner, 'cause I always kept my purse already with me out of previous experience that he tried to take things away from me.
And I said-I-First I struggled, 'cause I didn't wanted [sic] him to take my phone away, and he was just-He was pushing me, and then he was holding me at my throat and holded [sic] me back like that. And it caused me to fall back on the bed. And he has-He stepped on my foot, and I was just-I let go then because I figured I would get just hurt more if I wouldn't.
So he took my phone. And I didn't really quite know what to do. I was just in shock. And then he came back, and he wanted to get the car keys as well. And that would completely disable me to do whatever. So I just tried to hold on to my car keys, and I was basically laying on my car keys so he cannot snatch them away from me as well.
And he was struggling against and hurting me again by doing that because he was just trying to get to what he wanted. And, and then he let go. And instead of, of taking the car keys from me, then I was-I was still in the bedroom, and he left and he was doing whatever. I don't know. I went in the bathroom just to check, 'cause it started to hurt when I was swallowing, and I was just looking at myself to find out- *520 And he had the nerve to come there and say: Oh, are you hurt? Oh, is Swenja hurt?
And I just felt it was just, on top of everything, so disgusting, however. Then I just took my keys, and I said: I have to-I think I have to go now.
And he just stand [sic] in front of the door, and he said: I can't let you go.
And then I tried to be smart and go through the kitchen door. And he went to the kitchen door, and he said: No, I'm not letting you go. You can't go nowhere [sic].
And he called his sister, and he told them: Yeah, just make sure that somebody is available in case I need to call you guys.
And at that moment, it just struck me from the way he was saying it he probably means-thinks that I'm
going to the police and that somebody has-he has to be-somebody has to be available for him if I call the police.
So he didn't let me go. I went back to the front door, and he just didn't let me go. And in the end, he wind [sic] up leaving, but he took-He had-Both of cars were gone, so I had no chance of-I had no phone to call the police. I had no car to go wherever. So I was just there.
And then in the morning-He returned somewhere [sic] in the night. But, and in the morning, I had a tour-guiding job. And in this business, if you don't show up, it's a lot of dollars involved, and you just basically ruin your name. So I had this-I had the tour-guiding job, and then he left and left me with errands, and I had to take my son with me to the job. And we just called a streetcar 'cause we still had no car. And I had my purse, and I just-
Until that time, I was still so in shock and-But it was clear to me after I went there and I had done my tour with my son. I thought I cannot go back. So and I met my friend, which she's the tour guide too, and she has the connection to this travel agency we're working for. And she said, you know-And I told-She said: What's wrong with you?-'cause I was wearing a turtleneck and it was quite warm. And I just said: I think I can go home no more.
Ms. Thomas then testified that her friend brought her to the police. Ms. Thomas stated that this was not the first incidence of abuse, but was "the final thing, where I said I'm not safe here at all anymore, and I need to leave and I cannot go back." Afterwards, Ms. Thomas and her young son lived in a shelter.
Further, Ms. Thomas testified that Mr. Thomas "always gets so mad, and then he loses control." She stated that Mr. Thomas
was in a crazy mind frame that I-I'm not allowed to sleep. So he would pull me. Whenever I was laying down, he would pull me out of the bed, whatever he-It was mostly my ankles or my wrists or my upper arms. And he was doing that so rapidly that two days later or a day later, I was bruised up on my wrists and on my ankles and on my arms. And it's-My sister-in-law, I told her about it. She tried to talk to him, but it's worthless. It's not getting anywhere.
Ms. Thomas stated that Mr. Thomas had pulled her through their hallway by the hair when they lived in Germany.
According to Ms. Thomas, Mr. Thomas controlled everything, including the finances. She contended that Mr. Thomas would take away her debit card and keep track of all of her phone calls. Mr. Thomas also required receipts for all of her purchases.
Mr. Thomas testified that his marriage ended because Ms. Thomas' two adult *521 kids[4] lived with them, but wanted to stay home and not work. He stated that "[n]either of them wanted to do anything, and their mother was supporting them with it. Anything I did was wrong. I got to the point I stayed out of it completely." However, on cross-examination, Mr. Thomas admitted that he and Ms. Thomas were not married when the two adult kids were staying with them.
In regards to locking Ms. Thomas out of the family home, Mr. Thomas testified that he and his young son went to play laser tag until around 9:00 p.m. and he did not check his phone. Mr. Thomas stated that when they returned home, they ate, showered, and went to bed. According to Mr. Thomas, Ms. Thomas was screaming when she finally was able to return to the home. Mr. Thomas stated that he did not get physical with Ms. Thomas and that he did not control the finances.
On cross-examination Mr. Thomas admitted that Ms. Thomas was not allowed to authorize repairs to her vehicle. In fact, Ms. Thomas was in a vehicular accident within a few months of the hearing and he knew there was damage to her vehicle. However, he refused to authorize repairs to fix Ms. Thomas' vehicle. Further, counsel for Ms. Thomas admitted into evidence an e-mail from Mr. Thomas to Ms. Thomas wherein Mr. Thomas wrote the following:
Swenja, I want you know that I know I can't go on without you. I've never loved anyone as much as I love you. I've sat down over the last couple of days and realized just what you've been saying all the while. I should have been nicer to your family, and I will if given a chance. I should have been the man, bringing this family together not tear it apart; and I will if given a chance. I was stubborn and unaware of the damage I was causing, even with you telling me I was looking at things wrong; all will if given a chance. I DON'T WANT A DIVORCE, I JUST WANT MY FAMILY. Your [sic] the best thing that happened to me. I haven't been to sleep since you left. Please don't do this to me, if I never understood anything before in my life, trust me I do understand. I've failed my family, I can't live with that thought. Sister cried when she found out you were gone. I've cried everyday, I haven't worked, it's tearing me apart. My biggest mistake was neglecting you, and focusing strictly on Aaron. I'm sorry, and hopefully you give me a chance to prove it. Since you've been gone I see just how much you do around here. I could never praise you enough. I promise I'll treat you like the PRINCESS you are. You will always be able to hold your head up high, please give me a chance to redeem myself. I've said things I never should have said out of anger, I never meant it. You on the other hand never reverted to those type of tactics. Love you with all my heart
* * *
I promise to treat them all the same. None of them ever done me anything. I tried to enforce my way of life on
them, wrong again on my part. Had I listened to you, and let everyone be themselves, this family would be better. I owe this to them, if only I listened; and I will if given a chance. As a parent I must offer all of our kids the opportunity to succeed. I WILL IF GIVEN ONE MORE CHANCE.
SWENJA MAJA HEINEMANN-THOMAS I LOVE YOU
Your Husband Always
Royal Alvin Thomas Jr.
*522 "The trial court is vested with vast discretion in the determination of fault because this issue turns largely on evaluations of witness credibility." Schmitt , 09-0415, p. 3, 28 So.3d at 540. "A trial court's factual findings regarding fault in the area of domestic relations are to be given great deference, and findings of fact on the issue of a spouse's fault for the purposes of determining final periodic support will not be disturbed on appeal unless found to be manifestly erroneous." Id.
After reviewing the testimony and evidence presented, the trial court found that Ms. Thomas was a victim of domestic violence and was free from fault for the breakup of the marriage. Indelibly, the trial court's decision was based upon an evaluation of the credibility of Mr. and Ms. Thomas. This finding precludes a finding of abandonment. Given Ms. Thomas' testimony regarding the alleged abuse she suffered at the hands of Mr. Thomas, we find that the trial court did not abuse its discretion by crediting Ms. Thomas' testimony or manifestly err by determining that Ms. Thomas was free from fault.
FINAL PERIODIC SUPPORT
Mr. Thomas asserts that the trial court erroneously included attorney's fees, child care, travel expenses, and immigration costs in the award for final periodic support, which he also cannot afford to pay.
As noted above, La. C.C. art. 112(B) provides that the trial court shall award final periodic support when the spouse suffered from domestic abuse. (Emphasis added).
La. C.C. art. 112(C) states that the trial court shall consider the following factors when "determining the amount and duration" of the final periodic support:
(1) The income and means of the parties, including the liquidity of such means.
(2) The financial obligations of the parties, including any interim allowance or final child support obligation.
(3) The earning capacity of the parties.
(4) The effect of custody of children upon a party's earning capacity.
(5) The time necessary for the claimant to acquire appropriate education, training, or employment.
(6) The health and age of the parties.
(7) The duration of the marriage.
(8) The tax consequences to either or both parties.
(9) The existence, effect, and duration of any act of domestic abuse committed by the other spouse upon the claimant, regardless of whether the other spouse was prosecuted for the act of domestic violence.
Once the trial court made a finding of domestic abuse, the amount of final periodic support awarded pursuant to La. C.C. art. 112(B), "may exceed one-third of the obligor's net income." La. C.C. art. 112(D).
"The trial court is vested with much discretion in determining awards of spousal support." Shaw v. Young , 15-0974, p. 15 (La. App. 4 Cir. 8/17/16), 199 So.3d 1180, 1189. " 'Such determinations will not be disturbed absent abuse of discretion.' " Id. , (quoting Molony v. Harris , 09-1529, p. 2 (La. App. 4 Cir. 10/14/10), 51 So.3d 752, 756 ).
"Permanent alimony may cover such expenses as food, clothing, shelter, reasonable and necessary expenses for transportation, medical care, medication, utilities, household maintenance, and income tax liability arising from the alimony payments." McCarty v. McCarty , 00-2212, p. 5 (La. App. 4 Cir. 9/19/01), 798 So.2d 195, 198. "However, this Court has *523 held that permanent alimony should not cover such expenses as newspapers, gifts, recreation, vacations and church tithes." Id.
Ms. Thomas testified that she is the single mother of the minor child of the marriage. Ms. Thomas was a "government-certified optician" in Germany, but she would have to return to college in the United States to achieve equal status here. She stated that she does not have the financial wherewithal or time to do so. Therefore, Ms. Thomas works as an optician, which is "the closest it would come to my profession." Ms. Thomas testified that these limitations decreased her earning capacity. Ms. Thomas works a second job to "make enough money to live." Further, she stated that she "cannot work more than I do right now because I have nobody besides an agency that's a babysitter for" her minor child.
Ms. Thomas' net monthly income is $2,199.77. Her monthly expenses total $3,480,[5] leaving a shortfall of $1,280.23. Ms. Thomas was examined and cross-examined regarding her list of expenses, as depicted on her income and expense list.
*524 Counsel for Mr. Thomas did not object to any of Ms. Thomas' expenses.[6] Ms. Thomas requested $1,280.00 a month in final periodic support, which was less than the amount she received for interim spousal support.
Mr. Thomas testified that he was working two jobs: one for the Department of Defense ("DoD") and one for Ochsner. He stated that he received a letter from the DoD allegedly informing him that he could no longer keep his job with Ochsner. Mr. Thomas stated that he resigned from his Ochsner job approximately one month prior to the hearing. However, Mr. Thomas' counsel failed to admit a certified business document into evidence reflecting same.[7]
Mr. Thomas testified that his monthly retirement income is "about $1,990." His net monthly income is "[s]omething like" $1,557.57.[8] Mr. Thomas pays $698 a month for the child support of their minor child. Mr. Thomas stated that his expenses exceed his income and that being ordered to pay spousal support would "cause me a problem." Mr. Thomas did not bring his 2014 tax return to the hearing because he "didn't think [he] needed it."
On cross-examination, Mr. Thomas did not dispute that he receives roughly $3,424 a month gross income from the DoD and, up until about a month before the hearing, was receiving roughly $2,998.66 a month gross income from Ochsner. When asked about his monthly total gross income, Mr. Thomas stated that it was $3,373, as listed on the Statement of Income and Expenses. When confronted that the total gross income listed on the form, $3,373, was less than the singular gross income from the DoD, $3,424, Mr. Thomas stated that he "added my grosses off of both of those statements" and could not explain the discrepancy.
When awarding periodic final support, the trial court stated: "The Court has considered all relevant factors in determining the amount of the spousal support. Based on the testimony and exhibits presented into evidence, the Court shall grant Ms. Thomas a final periodic support of $1,280 a month."
Firstly, Mr. Thomas contends that the trial court awarded "support for expenses not necessary for maintenance." We disagree. The trial court issued a blanket award of $1,280.00 a month. The trial court did not specify what expenses that award was for. Without any delineation within the $1,280.00 award, we cannot say that the trial court awarded the support for unnecessary expenses.
Secondly, Mr. Thomas asserts that the trial court's award is excessive based on his income. Mr. Thomas' Statement of Income and Expenses did not accurately reflect his gross monthly income. His testimony and the evidence revealed that he receives around $1,990 in gross retirement income, $3,424 gross income from the DoD, and was receiving roughly $2,998.66 from Ochsner, which equals $8,412.66 in gross monthly income. Without including Ochsner,[9] that leaves $5,414 monthly gross income, which is greater than the $3,373.00 gross monthly income reported by Mr. Thomas. Further, La. C.C. art. 112(D) provides *525 that "where support is awarded pursuant to Paragraph B of this Article," to a spouse without fault and a victim of domestic abuse, "the sum awarded may exceed one-third of the obligor's net income." Moreover, in regards to La. C.C. art. 112, the trial court stated that it "considered all relevant factors in determining the amount of the spousal support."
Ms. Thomas testified that her ability to earn a living was impacted by the couple's move to the United States because she would be required to return to school in order to secure a job equal to her occupation in Germany. Likewise, as the single parent to the minor child, the amount of hours Ms. Thomas is able to work is limited. The trial court weighed this testimony, as well as that of Mr. Thomas, and reviewed the documentation of their respective income and expenses. As the trial court is vested with vast discretion when determining the amount of spousal support, and based on the unique facts and circumstances of this case, we cannot say that the trial court abused its discretion by awarding Ms. Thomas $1,280.00 in final periodic spousal support.
DECREE
For the above-mentioned reasons, we find that the trial court did not err by finding that Ms. Thomas was free from fault and was a victim of domestic abuse. We further find that the trial court did not abuse its discretion when determining Ms. Thomas' award for final periodic spousal support. Accordingly, the judgment of the trial court is affirmed.
AFFIRMED
LOBRANO, J., CONCURS IN THE RESULTS

Mr. Thomas is the father of one of Ms. Thomas' adult children.

Ms. Thomas' income and expense list includes the following expenses:
Rent $650.00 Electricity/gas $130.00 Water $57.00 Phone $80.00 Food (groceries) $500.00 Restaurants $80.00 Uncovered medical, etc. $100.00 Mortgage note $200.00 Gasoline $140.00 Maintenance $30.00 Parking $5.00 Books $20.00 Supplies $20.00 Clothing $80.00 Laundry & cleaning $30.00 Personal & grooming $150.00 Household supplies $50.00 Life insurance $12.00 Auto insurance $147.00 Child care $50.00 Recreation $100.00 Immigration costs $49.00 Attorney fees $500.00 Gifts to children $50.00 Gifts to others/travel $250.00 ____________________________________ Total $3480.00

The objection made by counsel for Mr. Thomas was in reference to a discussion of alleged child support arrearages.

Counsel for Mr. Thomas offered into evidence a copy of the letter allegedly received by Mr. Thomas. However, the copy was not certified. The trial court sustained an objection made regarding the admittance of said letter.

$1,557.57 was also listed as his net monthly income on his Statement of Income and Expenses.

Mr. Thomas' Statement of Income and Expenses does not indicate what date Mr. Thomas completed the form, i.e., before or after he stopped working for Ochsner.