924 So.2d 112 (2006)
Delton COUTEE
v.
GLOBAL MARINE DRILLING COMPANY.
No. 2005-C-0756.
Supreme Court of Louisiana.
February 22, 2006.
Rehearing Denied April 17, 2006.
*113 Fowler, Rodriguez & Chalos, George J. Fowler, III, Jon W. Wise, Delos E. Flint, Jr., New Orleans, Lemle & Kelleher, Lawrence R. DeMarcay, III, for applicant.
Rivers, Beck, Dalrymple & Ledet, Eugene A. Ledet, Jr., Alexandria, for respondent.
VICTORY, J.
We granted a writ application in this Jones Act case to determine whether the court of appeal violated the manifest error standard of review in reversing the trial court's ruling that the plaintiff failed to establish the defendant was negligent, or that the vessel or any of its appurtenances were not reasonably fit and safe for their intended purposes. After reviewing the record and the applicable law, we reverse the judgment of the court of appeal, which found that defendant's conduct constituted negligence per se, and reinstate the ruling of the trial court.

FACTS AND PROCEDURAL HISTORY
The facts surrounding this maritime accident are largely uncontested. On January 7, 2001, Delton Coutee ("Coutee") was *114 employed by Global Marine Drilling Company ("Global Marine") as a seaman aboard the drilling vessel GLOMAR ADRIATRIC II (the "ADRIATIC II"). The ADRIATIC II is a jack-up offshore drilling rig. At the time of the accident, it was situated in the Gulf of Mexico while the drilling crew conducted drilling operations. As part of the drilling crew, Coutee was occasionally required to work on the rig floor. Part of his work consisted of installing and removing various pieces of equipment attached to the well head. On the date of the accident, Coutee and the drill crew were in the process of removing the lubricator on the blow out preventer ("BOP") stack. The BOP is located on the well head underneath the drill floor and consists of a series of valves, over 15 feet high, stacked on top of each other which are used to control well pressure while drilling.
A hydrill is a component of the BOP stack that is located approximately four feet below the lubricator. The hydrill is a device designed to close around the drill pipe to keep gas from escaping from the well hole. To assist in the removal of the lubricator above the hydrill, Global attached a small step or platform to the side of the hydrill to give crew members a place to stand while working on the lubricator. This platform was crescent shaped, four feet long and 18 inches at its widest point. Testimony indicated that this platform was not available on most BOP stacks, but was instead put there by Global to make it easier for someone with a harness to work on the BOP. It was not a surface that anyone could walk on or access by any other means than by climbing the BOP stack with a riding belt and safety harness. While working on the BOP stack, Global Marine mandates, as a safety feature, that the crew wear fall restraint gear. Coutee was wearing a fall restraint system that included an inertia reel and safety harness that was set to catch a fall when the line played out at a certain velocity.
According to Coutee's accident report, the accident occurred as follows:
I was standing on the stack nippling down the lubricator. I was pulling on a wrench when the wrench slipped and I lost my footing. This caused me to fall off the stack about four feet before my safety harness and inertia reel broke my fall.
Coutee filed a Petition for Damages in the 15th Judicial District Court for the Parish of Lafayette against Global Marine under the Jones Act, 46 U.S.C.App. § 688, and the general maritime law. A four-day bench trial was held beginning on January 26, 2004. After considering the evidence, on February 17, 2004, the court issued a ruling in favor of Global Marine finding that Coutee failed to prove that Global Marine was negligent or that the ADRIATIC II was unseaworthy. A final judgment was rendered on March 4, 2004.
Specifically, on the issues of liability relevant to this writ application, the trial court made the following findings:
The true focus of this case relates to the absence of handrails on the half-moon deck and the performance of the SALA block/harness assembly. The half-moon platform is utilized to give workers access to the top of the BOP when they are installing or removing the bell nipple from the BOP. It is undisputed that the installation of this deck on the BOP on the Adriatic II was novel. Both the Plaintiff's and the Defendant's expert in offshore oil operations and safety testified the deck was a good idea. Don Bass, the night tool pusher on the Adriatic II, testified before the deck was installed, workers were required to utilize riding belts to gain access to the top *115 of the BOP. He also testified that is the method used on the drilling rig on which he is presently working.
Plaintiff's expert, Robert Kubelka, testified the half-moon deck was not in compliance with 33 CFR § 143.110 which provides that the unprotected perimeter of all floor or deck areas and openings shall be rimmed with guards and rails or wire mesh fence. He testified he had never seen a platform on a hydril such as the half-moon deck at issue in this case. He thought the deck was a good idea but it needed handrails. He testified that absent a half-moon deck such as this, workers performing work on this portion of the BOP could work from an elevating work platform such as the "Texas deck."
The suggestion of Plaintiff's expert that the Texas deck be elevated and used as a work platform was deemed unworkable by Don Bass. According to Mr. Bass, and supported by the photographs in evidence, the Texas deck could not be raised high enough to give workers access to the area in question. The location of hoses which maintain pressure prevent the raising of the Texas deck and removal of the hoses would cause a loss of pressure. The Court finds that the Texas deck could not be elevated and used for these purposes. Therefore, the only methods to gain access to this part of the BOP are a riding belt or placement of a special deck.
The method used by defendant was, in a sense, a combination of both. Rather than utilizing riding belts as the primary means of access, self-retracting lifelines were utilized as a backup safety measure and the half-moon platform was utilized as the primary means of access. Obviously, self-retracting lifelines are not designed to serve as primary access to work areas. As opposed to riding harnesses, they are designed for fall arrest. Guardrails or handrails are designed for fall prevention. Clearly the half-moon platform, being located more than ten feet above the production floor, was required to have some type of fall protection. Plaintiff contends guardrails were mandated by 33 CFR § 143.110 and the lack of guardrails is negligence per se. In order for a regulatory violation to amount to negligence per se under the Jones Act, five elements must be met:
1) a violation of a regulation;
2) plaintiff's membership in the class of intended beneficiaries of the regulation;
3) an injury of a type against which the regulations are designed to protect;
4) the unexcused nature of the regulatory violation; and
5) causation.
It appears the fourth element listed above is the point of dispute between the parties. Defendant's expert, Vernon Ramke, testified a forty-two (42") inch railing was not practical on an eighteen (18") inch wide platform on an oil rig. He pointed to the monkey board platform located in the derrick, as another example of a deck upon which handrails would prevent workers from doing their jobs. Eddie Bell testified the platform could not be made bigger "cause the way we rack it back on our rig, it wouldn't fit up in the racking place up there."
Mr. Kubelka also testified the monkey board, which is in the derrick, does not have guardrails. He agreed that rails are not practical for this area and workers use safety harnesses. However, he believed guardrails were required on the half-moon deck, even though safety harnesses are used.

*116 Defendant's expert testified the half-moon deck was a very good idea to help workers and was not against any regulations. In his opinion, the defendant took proper precautions for this job and that, in accordance with 33 CFR § [142.42], safety belts were used by the workers on the deck.
After considering the testimony of the witnesses, the photographs and the regulations, the Court finds the half-moon deck was a reasonably safe work area. Even if the lack of guardrails on the deck is a technical violation of 33 CFR § 143.110, the space constraints and the use of safety harnesses as a fall protection device adequately excuses the violation. Moreover, it is clear that the use of the deck in conjunction with the safety harness is superior to the use of riding belts alone. The use of riding belts alone to gain access to this work space was established, by the evidence, to be the normal practice. Therefore, the use of the half-moon deck, even in the absence of guardrails, was reasonable under the circumstances.
The court of appeal reversed on this issue, obstensibly under the manifest error standard of review, finding that the trial court erred in finding that the lack of guardrails around the half-moon platform did not amount to negligence per se. Coutee v. Global Marine Drilling Co., 04-1293 (La.App. 3 Cir. 2/16/05), 895 So.2d 631.[1] We granted Global Marine's writ application to determine whether the court of appeal properly applied the manifest error standard of review in reversing the trial court's finding that the lack of a guardrail did not constitute negligence on the part of Global Marine. Coutee v. Global Marine Drilling Co., 05-0756 (La.5/13/05), 902 So.2d 1000.

DISCUSSION
Louisiana courts of appeal apply the manifest error standard of review in general maritime and Jones Act cases. Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96), 676 So.2d 89, 96. Under the manifest error standard, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129, 132; Stobart v. State through DOTD, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Stobart, supra; Rosell, supra. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Id.; Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/3/02), 816 So.2d 270, 278-79. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.
*117 Generally, state courts exercising concurrent maritime jurisdiction are bound to apply substantive federal maritime statutory law and to follow United States Supreme Court maritime jurisprudence. Milstead, supra at 94 (citing Southern Pacific Company v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed.2d 1086 (1917)); Green v. Industrial Helicopters, 593 So.2d 634 (La.1992) (citing Powell v. Offshore Navigation, Inc., 644 F.2d 1063, 1065 n. 5 (5th Cir.1981)).
Under federal maritime law, there are five elements of a Jones Act negligence per se claim: (1) violation of a Coast Guard regulation; (2) the plaintiff's membership in the class of intended beneficiaries of the regulation; (3) an injury of a type against which the regulation is designed to protect; (4) the unexcused nature of the regulatory violation; and (5) causation. Smith v. Trans-World Drilling Co., 772 F.2d 157, 160 (5th Cir.1985); Reyes v. Vantage S.S. Co., Inc., 558 F.2d 238, 242-44 (5th Cir.1977) (Reyes I), modified on rehearing, 609 F.2d 140 (1980) (Reyes II). In a tort case, the plaintiff must prove by a preponderance of the evidence both the negligence of the defendant and the damages caused by the defendant's fault. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971). The plaintiff also has the burden of producing evidence from which reasonable minds could conclude that his or her claim has been established under the applicable standard. Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise, Vol. 1, Civil Procedure, § 11.7, p. 283.
In this case, plaintiff attempted to prove that Global Marine violated 33 C.F.R. § 143.110, which provides in pertinent part:
§ 143.110 Guards and rails.
(a) Except for helicopter landing decks which are provided for in paragraph (b) of this section, and areas not normally occupied, the unprotected perimeter of all floor or deck areas and openings shall be rimmed with guards and rails or wire mesh fence. The guard rail or fence shall be at least 42 inches high.. . . (Emphasis added.)

The court of appeal reasoned that the trial court held this regulation was applicable to the half-moon platform and that Global Marine had violated the regulation:
Global Marine argues, for the first time on appeal, that 33 C.F.R. § 143.110 is inapplicable to the present case because it is an "area not normally occupied;" therefore, guard rails are not necessary. In its written reasons for ruling, the trial court stated: "Clearly the half-moon platform being located more than ten feet above the production floor, was required to have some type of fall protection." We infer from this statement that the trial court found the "area[ ][was] normally occupied" such that 33 C.F.R. § 143.110 requiring guard rails in such areas, was applicable and that Global Marine violated the regulation. The issue is whether the trial court was correct in finding that the lack of guard rails, a violation of 33 C.F.R. § 143.110, did not amount to negligence per se.[2]
895 So.2d at 638.
That is an incorrect characterization of the trial court's ruling. The reference to *118 the platform "being located more than ten feet above the production floor" and therefore requiring some type of "fall protection" obviously refers to 33 C.F.R. § 142.42, which provides:
§ 142.42 Safety belts and lifelines.
(a) Except when moving from one location to another, personnel engaged in an activity where there is a hazard of falling 10 or more feet shall wear a safety belt or harness secured by a lanyard to a lifeline, drop line, or fixed anchorage.
(b) Each safety belt, harness, lanyard, lifeline, and drop line must meet the specifications of ANSI A10.14.
As the trial court properly pointed out, "guardrails and handrails are designed for fall prevention," not "fall protection" which is what the safety belts and harnesses mandated by 33 C.F.R. § 142.42 are designed to do. The trial court's reasoning demonstrates that it did not find that 33 C.F.R. § 143.110 was applicable and was violated. To the contrary, the trial court found that "after considering the testimony of the witnesses, the photographs and the regulations, . . . the half-moon deck was a reasonably safe place to work." In support of this finding, the trial court cited the plaintiff's expert testimony that even the monkey board, which was much larger than the half-moon platform at issue, does not require the use of guardrails because guardrails would be impractical and workers on the monkey deck use safety harnesses. The trial court also cited defendant's expert testimony that the half-moon platform was a very good idea, was not against any regulations and that Global Marine took the proper precautions in accordance with 33 C.F.R. § 142.42 by requiring the use of safety harnesses. That testimony, along with the rest of the evidence presented at trial, provides a reasonable basis for the trial court's finding that 33 C.F.R. § 143.110 was not violated. The trial court's further finding that "[e]ven if the lack of guardrails on the deck is a technical violation of 33 C.F.R. § 143.110, the space constraints and the use of safety harnesses as a fall protection device adequately excuses the violation" was an alternative finding, rather than, as plaintiff contends, a finding that 33 C.F.R. § 143.110 was applicable and was violated.
In this case, the trial court was presented with two competing safety regulations; one requiring fall protection devices, 33 C.F.R. § 142.42, and one requiring fall prevention devices, 33 C.F.R. § 143.110. By requiring safety harnesses where there is a hazard that workers may fall more *119 than 10 feet, the regulations implicitly recognize that workers will be required to work at such heights while suspended. No one contests the fact that Global Marine was under no obligation to install the half-moon platform. It was not a violation of the regulations to not have this platform. It was put there as a work aid so the workers could have better footing while doing their job. Notwithstanding the fact that the evidence clearly showed that a 42-inch railing would have been impossible on that half-moon platform because of space constraints and maneuverability while working on the BOP, the use of guardrails would have been redundant in light of the adequate fall protection, i.e., the safety harnesses, mandated by the Coast Guard regulations and provided by Global Marine. It was uncontested at trial that 33 C.F.R. § 142.42 was applicable and that Global Marine complied with that regulation. Further, there was no allegation that the addition of this half-moon platform increased plaintiff's risk or increased his damages. It is unreasonable to hold Global Marine liable for violation of a Coast Guard regulation of very questionable applicability, where it has complied with the regulation directly on point which supplied all the fall protection called for by the Coast Guard regulations, especially given that the trial court found the use of the platform actually made working conditions safer than the use of safety harnesses alone.
Finally, there was no evidence presented that this was an area normally occupied. To the contrary, the record clearly shows the platform was installed on the hydrill in the early 1990s and is used when it is necessary to remove four bolts during the process of nippling up or nippling down the bell nipple or lubricator. No one stands on this platform except for that reason, and only when properly using the safety harness. The hydrill itself is not even permanently attached to the BOP stack and is usually stowed out of the way when not in use. In addition, the half-moon platform is also removable.[3]

CONCLUSION
In this case, the trial court held a four-day trial on the merits and ruled that a Coast Guard regulation requiring 42-inch guardrails on the "unprotected perimeter of all floor or deck areas and openings" was not violated by the use of an 18-inch half-moon shaped platform without guardrails placed atop a hydrill on a BOP to improve the working conditions aboard this drilling vessel. This finding was clearly supported by a reasonable factual basis in the record. Thus, the court of appeal erred in reversing this ruling under the manifest error standard. Because plaintiff failed to prove the first element of the negligence per se analysis, i.e., that a Coast Guard regulation had been violated, the plaintiff is not entitled to damages.

*120 DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed and the judgment of the trial court is reinstated.
REVERSED.
NOTES
[1] The court of appeal also reversed the trial court's judgment that settlement advances in the amount of $17,633.00 served as a set off to satisfy the $1,885.11 cure award and awarded Coutee $1,885.11 in cure benefits. The court of appeal also awarded Coutee $10,000.00 in attorney fees for Global Marine's arbitrary and capricious refusal to authorize examinations by doctors of Coutee's choice. In addition, the court of appeal awarded Coutee: (1) general damages in the amount of $100,000.00; (2) past lost wages in the amount of $60,000.00; and (3) future lost earnings in the amount of $300,000.00.
[2] After citing the relevant law on negligence per se found in Smith, supra, the court of appeal continued its analysis as follows:

In the present case, the trial court found that Mr. Coutee had met every element of proof for negligence per se with the exception of number (4), when it concluded that the failure of Global Marine to provide guard rails on the hydrill platform was excused due to space constraints.
We agree with the trial court that 33 C.F.R. § is applicable to the platform in this case and that Global Marine violated that regulation. We disagree with the trial court's conclusion that Global Marine's failure to provide guard rails on the hydrill platform is excused, thus precluding a finding of negligence per se. There is nothing in Section 143.110 or jurisprudence that excuses the failure to provide proper fall protection due to lack of space. In Smith, the court, in finding that the violation of a safety regulation was excused, stated "there was no showing of a present emergency or other condition where installation of a railing would have been more dangerous than violation of the regulations." Smith, 772 F.2d at 161. (Emphasis added). Likewise, in the present case, there was no evidence of an emergency or a condition that would have made it more dangerous to install guardrails than to violate 33 C.F.R. 143.110 which requires "unprotected perimeters of all floor or deck areas [to be] rimmed with guard rails." Therefore, we find that the trial court erred in concluding that Global Marine's failure to provide guard rails on the work platform was an excusable violation of 33 C.F.R. § 143.110.
895 So.2d at 638-39. Because the trial court in fact ruled that the lack of guard rails was not a violation of 33 C.F.R. § 143.110 and that finding was not manifestly erroneous, we need not address the court of appeal's finding above that the violation was an unexcused violation.
[3] Plaintiff contends the nippling up and down maneuvers were performed "multiple times" during the drilling of the well. Plaintiff's expert indicated there were several strings of casing run of this particular well, and plaintiff argues that this means the platform would have been utilized no less than ten times. The evidence also appears to show that each maneuver may have lasted a few hours. However, whether this means the area was normally occupied over the life of the well was never proven as there was no evidence which showed how long the life of the well was. The IADC reports only cover a two-week period, from January 4-18, 2001, the testimony established by this point the well had been drilled and the hole cemented, and at oral argument plaintiff's counsel acknowledged that the life of the well was probably greater than 120 days. In sum, there was not sufficient evidence presented to show that this platform was an area normally occupied.