| MARK STEPHEN JASKOT AND DIANE M. ROBERTSON JASKOT | * | NO. 2019-CA-0207 |
|---|---|---|
| | * | |
| | | COURT OF APPEAL |
| VERSUS | * | |
| | | FOURTH CIRCUIT |
| LYLE K. DOUBLET AND RIVERSIDE INSPECTIONS, LLC | * | STATE OF LOUISIANA |
| | * * * * * * * | |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2016-05950, DIVISION "F"
Honorable Christopher J. Bruno, Judge
* * * * * *
**Judge Joy Cossich Lobrano**
* * * * * *
(Court composed of Judge Roland L. Belsome, Judge Daniel L. Dysart, Judge Joy Cossich Lobrano)

Susannah C. McKinney
Douglas R. Kraus
Lisa Brener
Chelsea B. Cusimano
BRENER LAW FIRM, LLC
3640 Magazine Street
New Orleans, LA 70115

  COUNSEL FOR PLAINTIFF/APPELLEE

Cesar Roberto Burgos
Robert Joseph Daigre
Gabriel O. Mondino
George M. McGregor
BURGOS & ASSOCIATES, LLC
3535 Canal Street
New Orleans, LA 70119

  COUNSEL FOR DEFENDANT/APPELLANT

        **AFFIRMED.**

        **MARCH 4, 2020**

This is a redhibition case. Suit was filed on June 21, 2016 by Mark and Diane Jaskot ("Jaskots") against Lyle K. Doublet ("Doublet"), and Riverside Inspections, LLC ("Riverside"), for redhibition[1] and damages sustained following the purchase of immovable property located on Lesseps St., New Orleans, Louisiana ("the Property"). The Jaskots pled that Doublet committed fraud in failing to disclose defects in the Property, was a manufacturer, and presumed to know of the defects in the Property when it was sold. In the alternative, they pled that, if he was not a manufacturer, Doublet was aware of the defective nature of the construction when he sold the Property. Doublet countered that the Jaskots made a valid waiver of their warranty for redhibition, failed to introduce evidence of the reduction of the purchase price they sought, hired an inspection service that admittedly failed to perform a complete inspection, and had access to their real

_____

[1] Riverside was dismissed on appeal under an exception of prematurity related to an arbitration clause in its inspection contract. Riverside and the Jaskots eventually settled.

1

estate agent for any concerns they may have had prior to the purchase. After reviewing the record and applicable law, and for the reasons that follow, we affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

The Jaskots and Doublet entered into a Louisiana Residential Agreement to Buy or Sell ("the Agreement") on May 10, 2015 for a price of $227,500. The Jaskots acknowledged that the Property was being sold as it existed in its "apparent current condition[.]" However, they had a ten day inspection and due diligence period. The Agreement provides in relevant part:

> If the BUYER is not satisfied with the condition of the Property or the results of the BUYER'S due diligence investigation, the BUYER may choose one of the following options within the inspection and due diligence period: Option 1: The BUYER may elect, in writing, to terminate the Agreement and declare the Agreement null and void;"

In connection with the Agreement, Doublet provided a Property Disclosure Document for Residential Real Estate ("Disclosure Document"). Doublet indicated that the Property had never had wood-destroying termites or organisms and as such, no damage to the Property from wood-destroying termites or organisms existed. He wrote, however, that the damage from the termites, which were not currently present, was repaired. He noted no structural defects, but acknowledged that the foundation was repaired. The roof was described as new and Doublet checked "No" to the question "[W]ere any additions or alterations made to the Property?" Since he checked "No," he did not answer the next question that related to obtaining the necessary permits and inspections for an addition and/or alteration.

2

The Jaskots hired Riverside to perform an inspection of the Property. Jason Pelloat ("Pelloat") inspected the Property on May 13, 2015. Pelloat noted that the roof was new, but was only able to inspect 60 percent of the second-floor roof. He found the "West Chimney" "defective," noting, "no flue cap/rain cap allowing rain to go directly into the interior of the house/kitchen…[and]…improper flashing material, not properly sealed." Pelloat stated that the house had a wood frame with a concrete foundation, but that the "joists/trusses" were defective. He wrote, "wood destroying insect damage to floor joist in the crawl space [was] sistered[2] with new joist. They should have been removed." In the second-floor guest bedroom, Pelloat noted an "open hole in old fireplace chase." The Property had both first and second-floor attics. Pelloat only inspected 70 percent of the first-floor attic, noting, "prior wood destroying insect damage. A structural engineer is recommended to evaluate and estimate repairs."

Pelloat found "insufficient ventilation for size of structure and recommend[ed] additional ventilation be installed." Pelloat only accessed 60 percent of the second-floor attic. He identified more evidence of termite damage and again recommended that the Jaskots retain a structural engineer for further inspection. The last area he inspected was the crawl space of which he could only access 30 percent. He again noted "previous wood destroying insect damage," and pointed out a number of minor deficiencies.

---

[2] A sistered joist is a joist that spans the entire distance and has another equally sized joist attached alongside a length of it to strengthen a damaged portion of the original joist or to provide additional stiffness and support if the sisters both span the entire distance. www.nachi.org/forum/f23/sistered-floor-joists-28830

The Jaskots sent a Property Inspection Response ("Inspection Response") to Doublet on May 20, 2015, which included all of the items identified by Pelloat.

Doublet asked architect, Mark Roberts ("Roberts"), to perform a structural engineering evaluation of only those areas damaged by termite infestation as identified by Riverside. Roberts sent an engineer who found the damage repaired by sistering the damaged joints. He did not evaluate the foundation or any other part of the Property. The Jaskots received the report before the sale. The Jaskots aver that Doublet led them to believe that he remediated all of the alleged problems identified in their Inspection Response.

The parties entered into a cash sale of the Property on June 12, 2015 and signed a Waiver of Warranty and Redhibition Rights Addendum ("Waiver"). They moved into the Property on June 20, 2015. Within a month of moving in, Ms. Jaskot noticed a musty odor in the house. She noticed a strong smell just past her dining room. She saw mold going up the wall behind the baseboards. The wall was cutout and the mold removed. When delivering the appliances to the home, the installer noticed that the water lines were incorrectly installed: the washing machine had two hot water lines, and the bathroom had two cold water lines.

Ms. Jaskot took photographs of the defects.[3] Ms. Jaskot also produced a video of water running down an upstairs bathroom wall migrating into a baseboard.

---

[3] The photographs showed cracks above a doorway; cracks in the wall going up the stairs; cracks in the interior brick walls in the dining room, kitchen, hallway and upstairs bedroom; the back of the wood flooring revealed an absence of a "solid vapor barrier;" an opening in the camel back roof; debris found in the hallway chimney; pictures of what Ms. Jaskot described as mold; removal of sheetrock due to mold; allegedly faulty chimney repairs; various cracks throughout the house; ill-fitting doors and windows; cracks in outside steps; foundation cracks; separating tile in a bathroom and the kitchen; "side door-jam separation;" buckling wood flooring; and an unsealed kitchen vent.

Ms. Jaskot spent months working on the house herself. She caulked and sealed cracks, and painted the laundry room and two bathrooms. She attempted to contact Doublet in September 2015, but he never came to the house or otherwise responded.

Ms. Jaskot admitted under cross-examination that she was aware that the Property had been materially modified but was uninformed that additional square footage was added. Ms. Jaskot never questioned the obvious inconsistencies in the Disclosure Document signed by Doublet. She admitted she never asked for any clarifications; she relied upon her realtor to explain the document to her. She acknowledged that Riverside failed to access certain areas of the house. They did not retain a structural engineer to perform an additional inspection.

Ms. Jaskot was shown a policy from American Home Shield Policy ("Policy") Doublet had purchased prior to the sale. It covered mostly appliances and other items such as "ductwork, electrical, improper installations. Repairs, or Modifications, Permit fees..." Ms. Jaskot was unaware the Policy might cover some of the problems she was experiencing. She hired Eric Lassair of TeleJacks & Things ("Lassair") to perform repair work on the first-floor heating unit without first determining whether the Policy covered the damage. She also had someone fix the hot and cold water lines without making a claim under the Policy.

Mr. Jaskot testified that he first saw the Property for sale on the Multiple Listing Service ("MLS")[4] while performing an internet search. The "public

_____

[4] MLS.com is a free MLS search to find real estate MLS listings for sale by Realtors and other realty professionals that are members of a local MLS Multiple Listing Service.

5

remarks" section represented that the Property was "taken down to the studs." Mr. Jaskot's testimony was consistent with his wife's on when they first began noticing problems with the Property. He understood that the Disclosure Document was a statement by the seller about the quality of the Property. Mr. Jaskot relied upon Doublet's representations and was unaware of any defects in the Property at the time of the sale. Mr. Jaskot contacted Doublet about addressing the problems noted in the Inspection Response. Doublet advised that he had addressed all of their concerns. The Jaskots bought the Property under the assumption that Doublet performed all the all repairs.

Doublet testified that he bought the Property for investment purposes. He held no licenses in home renovation or construction. Doublet submitted a cost estimate to the City of New Orleans for permitting under a company called Mid-South Developers; he relied on this company for its contractor's license. The master application noted that the renovation was non-structural. The scope of work as described by Mr. Doublet included "new electrical, plumbing, A/C, repair or replace rotten wood, new roof, and new floors."

Under cross-examination, Doublet stated he did not put anything else in the box about the scope of work because it would not fit. Doublet did not anticipate an increase in the scope of work until after he started working on the Property. When asked why he did not amend his permit application, Doublet said he relied on the City of New Orleans inspectors to point out any deficiency. He claimed to be unaware of any defects in the Property when he sold it to the Jaskots.

Doublet went over the Disclosure Document with his real estate agent, Katherine Bosio, but not "with a fine tooth comb." They were not "very focused" on the Disclosure Document, as they were discussing "nonrelated stuff and filling stuff out." Doublet did not believe he answered the renovation/alteration question incorrectly by stating "no." He offered that, since he did not increase the "footprint"[5] of the house, it was not a renovation or alteration. Doublet testified that the agent did not discuss with him the need to be truthful and accurate in answering the Disclosure Document. Doublet answered "no" to the question about termite damage because he believed that he had fixed the damage, and thought the question related to the present and not the past. Doublet stated that he did not willfully misrepresent anything on the form and, if questioned, he would have fixed it. He stated that he filled it out to the best of his "knowledge, information, and belief." Doublet admitted that the rebuild of the camelback increased the square footage of the house from 1,800 square feet to a total square footage of 2,113, with 2,022 of living space. He did not, however, place that information in the Disclosure Document or place the extent of renovations and increased square footage in his permit application.

Doublet testified that he never uses vapor barriers on raised houses because raised homes are properly ventilated. His floor installer told him the glue used to secure the flooring acted as a vapor barrier. Doublet did not rely on architectural or

---

[5] "Building footprint" means the perimeter of a building at the outer edge of the outside walls of the building, including cantilevered portions of a building.
https://www.lawinsider.com/dictionary/building-footprint

engineering plans because he did not need them. Doublet stated that this was not the first property he had renovated and sold. He was unaware of the alleged defects in the Property when sold to the Jaskots.

Ms. Bosio, the agent who handled Doublet's purchase of and sale of the Property, testified that she drafted the MLS statement about the condition of the property, listing the square footage of living space as 2,022. The MLS statement advertised the Property as "being taken down to the studs" and "fully renovated." In conjunction with preparing the MLS statement, she also went through the Disclosure Document with Doublet; she was with him when he filled it out and reviewed it once completed.

Ms. Bosio and Doublet had a conversation about the renovation/alteration question. She knew that Doublet had taken the camelback down to the studs, completely rebuilt it, and added square footage. When she questioned his "no" answer, Doublet said that it was not altered or renovated because the "footprint" of the Property remained the same, even though square footage had been added. While Ms. Bosio was unfamiliar with La. R.S. 9:3198,[6] she advised Doublet that he was required to answer all questions in good faith.

Barry Scairono ("Scairono"), qualified as an expert in architecture and construction estimates, examined the Property and rendered an expert report for the Jaskots. After detailing all the Property's construction defects, he provided an itemized list of costs to make the necessary repairs. He also spoke with Doublet

_____

[6] La. R.S. 9:3198, *et seq.*, oversees residential property disclosures and applies to the transfer of any interest in residential real property.

who claimed to be a licensed contractor, however, he found no proof to support this. Scairono testified that the original portion of the Property was probably more than 75 years old but that Doublet rebuilt the rear two-story "camelback" in 2015.

Scairono examined Doublet's permitting application. He explained that when a damage assessment percentage is 50 percent or greater, the structure must comply with current codes as if it was completely new. In Doublet's application, he listed the damage assessment percentage as 48 percent. In Scairono's expert opinion, the scope and cost of the work performed on the Property far exceeded that stated in the permit application. Scairono also noted that the permit application stated that the Property possessed 1,800 square feet and was never changed by Doublet.

Scairono's entire estimate to fix all the defects in the Property exceeded $100,000.

Lassair also testified and provided an itemized list of the Property's needed repairs. For the most part, Lassair agreed with Scairono as to the defects in the Property but estimated the repairs at $64,525. The primary difference concerned the types of methods and materials used to make those repairs.[7]

Finding in favor of the Jaskots, the district court stated:

> This Court, weighing the credibility of the parties, finds that the Jaskots have set forth a valid Redhibition claim against Mr. Doublet. Mr. Doublet's testimony regarding his knowledge of the defects in the Property, as well as his statements made in the disclosure were not credible. Additionally, Mr. Doublet played fast and loose with the permitting process. His testimony that it was the City of New Orleans'

---

[7] Scairono admitted on more than one occasion that the use of less expensive methods and materials would reduce his estimates.

responsibility to ensure that he complied with the permitting and inspection process was totally disingenuous. Mr. Doublet failed to include any reference in his application to foundation work or any structural work. He purposely checked "non-structural" when he filed [sic] out his master application. The waiver signed by the Jaskots was clear and unambiguous, and brought to their attention, and thus valid under La. Civ. Code Art. 2548. However, the waiver does not apply because this Court finds that Mr. Doublet was a manufacturer under La. Civ. Code Art. 2445. Further, even if Mr. Doublet is not a manufacturer, this Court finds that he knew of the defects in the Property when he sold it.[8]

* * *

Mr. Doublet not only constructed the house, but built it without any architectural or engineering plans. This was not Mr. Doublet's first renovation and sale. Ms. Bosio testified that she sold other properties that Mr. Doublet had renovated in the past. The Property in question was a major renovation down to the studs, with an expansion of the square footage by someone who testified that he routinely does this type work and who should know the qualities, good or bad, of the Property he renovated and sold. This Court finds that Mr. Doublet is presumed to have known about the foundational problems, the lack of a vapor barrier, and the intrusion of water under the Property when he sold it to the Jaskots.

* * *

The Jaskots were reasonable in their reliance upon the Riverside report and Mr. Robert's report. Mr. Doublet argues that the Jaskots were aware that the home inspector was unable to inspect certain areas under the house and in the attic. This Court finds that the purchasers were reasonable in their reliance upon the inspection report of Riverside. . .The inspector from Riverside found areas of serious concern, and noted that he could not access certain areas. The Jaskots brought the apparent deficiencies to the attention of Mr. Doublet, who went so far as to hire a structural engineer who focused only on the apparent damage to the joists resulting from termite infestation. The structural engineer did not comment on any other structural problems with the house. This Court finds that the Jaskots' conduct was reasonable when compared to Doublet's knowledge of and attempts to hide the defects through an unusual and strained interpretation of the words "renovate" and "alteration."

The district court found that the Jaskots were entitled to a reduction of the purchase price. In arriving at the award, the court used individual line items from both Scairono and Lassair, arriving at a total of $84,525, which

---

[8] Doublet did not assign as error the district court's finding that he was a "manufacturer" *See* La. C.C. art. 2545 *supra*. As a result, we decline to discuss the court's finding.

10

excluded any repairs covered by the Policy. The court also awarded $15,000

for inconvenience and mental anguish and $35,000 in attorney's fees.

**ASSIGNMENTS OF ERROR**

1. The Trial Court erred in finding the Property at issue contained redhibitory defects.

2. The Trial Court erred in finding that the Jaskots satisfied their duty to make a reasonable inspection in light of all the circumstances surrounding the sale.

3. The Trial Court erred in finding that the Jaskots met their burden of proof seeking a reduction of the purchase price as they failed to introduce any evidence of the reduction of the purchase price they were seeking.

4. In the alternative, the Trial Court erred in determining the cost of the reduction of the purchase price.

**DISCUSSION**

***Standard of Review***

Appellate courts review a district court's findings of fact using the manifest error or clearly wrong standard of review. *Hall v. Folger Coffee Co.*, 03-1734, p. 9 (La. 4/14/04), 874 So.2d 90, 98; *Kocher v. Truth in Politics*, 19-0993, p. 4 (La.App. 4 Cir. 11/15/19), 283 So.3d 649, 652. Thus, we will not set aside a "district court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety." *Hall,* 03-1734, p. 9, 874 So.2d at 98. "In order to reverse a fact finder's determination of fact, an appellate court must ... (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous." *Coutee v. Glob. Marine Drilling Co.*, 05-0756, p. 5 (La. 2/22/06), 924 So.2d 112, 116. We "must not re-weigh the evidence or substitute [our] own factual findings because [we] would have decided the case differently." *Id.*; *Davis v. Nola Home Construction, L.L.C.,* 16-1274, p. 7 (La.App. 4 Cir. 6/14/17), 222 So.3d 833, 840.

"Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong." *Coutee*, 05-0756, pp. 5-6, 924 So.2d at 116. "This particular standard of review is based, in part, on the trial court's ability to better evaluate the testimony of live witnesses, compared with an appellate court's sole reliance upon a written record." *A.S. v. D.S.*, 14-1098, p. 9 (La.App. 4 Cir. 4/8/15), 165 So.3d 247, 253; *Davis,* 16-1214, p. 7, 222 So.3d at 840.

*Bradix v. Advance Stores Company, Inc.*, 17-0166, pp. 3-4 (La.App. 4 Cir. 8/16/17), 226 So.3d 523, 527.

Many of the district court's factual findings herein rest on its determinations of credibility. "Credibility determinations, including evaluating expert witness testimony, are for the trier of fact." *Jones v. Harris,* 04-0965, p. 15 (La.App. 4 Cir. 2/2/05), 896 So.2d 237, 246 (citing *Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc.,* 99-0201, p. 6 (La. 10/19/99), 748 So.2d 417, 421); "Such credibility determinations are factual findings governed by the well-settled manifest error standard of review." *Id.*

### Redhibition

Doublet first argues that the district court erred in finding redhibitory defects in the Property.

The Jaskots alleged a cause of action for redhibition under La. C.C. art. 2520.[9] Under this article, redhibitory defects fall into two categories. The first allows a purchaser to rescind the sale if the defect claimed renders the property useless "or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect." *Id.* The second allows the purchaser to reduce the price where the defect "diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price." *Id.*

"A seller owes no warranty for defects in the thing known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer of such things." La. C.C. art. 2521. "The buyer must give the seller

---

[9] Finding that the Jaskots proved their claim for redhibition, the district court dismissed the cause of action for fraud.

notice of the existence of a redhibitory defect in the thing sold. Such notice is not required when the seller has actual knowledge of the existence of a redhibitory defect in the thing sold." La. C.C. art. 2522. "The warranty against redhibitory defects covers only defects that exist at the time of delivery. The defect shall be presumed to have existed at the time of delivery if it appears within three days from that time." La. C.C. art. 2530.

La. C.C. art. 2545 reads in pertinent part:

> A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees.

Pursuant to La. C.C. art. 2548, the parties to a contract of sale may agree to a waiver of redhibition.

> To be valid, the terms of the exclusion or limitation must be clear and unambiguous and must be brought to the attention of the buyer. A buyer is not bound by an otherwise effective exclusion or limitation of the warranty when the seller has declared that the thing has a quality that he knew it did not have.

Doublet and Ms. Bosio testified about his completion of the Disclosure Document. La. R.S. 9:3198, *et seq.*, oversees residential property disclosures and applies to the transfer of any interest in residential real property. Under La. R.S. 9:3198, the seller of a residential property is required to complete a Disclosure Document. The Disclosure Document must be completed by the seller "in good faith to the best of the seller's belief and knowledge as of the date the disclosure is completed and signed by the seller," La. R.S. 9:3198(B)(1). A real estate licensee representing either a seller or buyer of residential real property must inform them of the duties and rights under this Chapter. La. R.S. 9:3199. Pursuant to this

13

statute, a seller is not liable to disclose "any error, inaccuracy, or omission" if the "error, inaccuracy, or omission was not a willful misrepresentation according to the best of the seller's information, knowledge, and belief." La. R.S. 9:3198(E)(1).

In finding that the Jaskots made a valid redhibition claim, the district court weighed the credibility of the parties. The court specifically found, "Mr. Doublet's testimony regarding his knowledge of the defects in the Property, as well as his statements made in the disclosure were not credible." After reviewing the record, no evidence exists to conclude that these findings are clearly wrong or manifestly erroneous. The district court evaluated the testimony of the witnesses before arriving at its factual findings. *See, e.g., Spencer v. Chevron Corp.*, 16-0174, pp. 4-5 (La. App. 4 Cir. 9/28/16), 202 So.3d 1055, 1057-58.

We further find reasonable bases for the district court's factual findings. *See Coutee,* 05-0756, p. 5, 924 So.2d at 116. When answering the question of whether the Property had been altered or renovated, Doublet answered "no," because its "footprint" had not increased. Tearing the camelback down to the studs and rebuilding it certainly qualifies as a "renovation" as the word is commonly used. In addition, that 200-300 square feet were added to the Property was not contained in the MLS listing or the permit application. The district court noted Doublet knew of, and attempted to hide, the defects through "an unusual and strained interpretation of the words 'renovate' and 'alteration.'" Again, these findings are not clearly wrong or manifestly erroneous.

### *Waiver of Warranty and Redhibition Rights*

The Jaskots signed the Waiver when they purchased the Property. Doublet argues that the Waiver is valid because the Jaskots relied on an "admittedly deficient Riverside inspection," failed to see defects in the Property that were

14

apparent and discoverable by a simple inspection, and did not obtain an additional inspection despite the defects noted by Riverside in its inspection report.

"Pursuant to La. C.C. art. 2548, parties can exclude or limit the warranty against redhibitory defects. In order to be effective, a waiver of warranty must be (1) written in clear and unambiguous terms; (2) be contained in the contract; and, (3) either be brought to the attention of the buyer or explained to him." *Royal v. Cook,* 07-1465, pp 11 (La.App. 4 Cir. 4/23/08), 984 So.2d 156, 165. In this case, the district court found the Waiver effective and valid on its face: the clause was clear and unambiguous, and contained an executed acknowledgment stating that the clause was explained, read, and understood by the Jaskots.

However, even when a waiver is sufficient as to form and to attract the attention of the purchaser, it may not be effective where the seller knew or should have known of the defect and failed to declare it. La. C.C. art. 2548 provides "[a] buyer is not bound by an otherwise effective exclusion or limitation of warranty when the seller has declared that the thing has a quality that he knew it did not have." In *Boos v. Benson Jeep–Eagle Co., Inc.,* 98-1424, p. 3 (La.App. 4 Cir. 6/24/98), 717 So.2d 661, 665 (quoting *Helwick v. Montgomery Ventures, Ltd.,* 95-0765, p. 7 (La.App. 4 Cir. 12/14/95), 665 So.2d 1303, 1306), we held:

> A seller with knowledge of a redhibitory defect who, rather than informing the buyer of the defect, opts to obtain a waiver of the warranty implied by law, commits fraud, which vitiates the waiver because it is not made in good faith.

The Louisiana Supreme Court addressed a similar issue in *Valorbra v. Nelson,* 14-0164 (La. 4/11/14), 136 So.3d 793. Plaintiff buyers purchased a home and signed a waiver of redhibition. Plaintiffs alleged that the sellers, given the option to choose in the disclosure form required by La. R.S. 9:3198 *et seq.,* "yes,"

15

"no," or "no knowledge," checked the "no" boxes for each inquiry regarding defects in the property. *Id,* p. 1, 136 So.3d at 794. However, after the discovery of defects, the sellers claimed not to know of any defects that may have existed in the premises. The Court stated:

> Here, it seems the sellers wish to avoid being deemed to have declared that the thing sold had a quality (no defects) that they knew it did not have by claiming that they did not know, one way or another, because they were not in a position to know, whether the thing they sold had defects or not (and thus their representation that the thing sold had "no" defects is excused).
> * * *
> We do not believe that a seller can represent a thing to have no defects in order to procure a waiver of redhibition and then claim that they were not in a position to know whether there were defects or not, as alleged by the plaintiffs, while using the waiver of redhibition to require the buyer to prove actual knowledge of the defect by the seller rather than merely that the thing sold contained a defect which rendered it useless (regardless of the seller's knowledge of same). Sellers cannot avoid their representation of no defects by claiming "we really didn't know."

*Id.,* 14-0164, pp. 2-3, 136 So.3d at 795.

As in *Valorbra,* Doublet cannot argue that he was unaware of the Property's defects in order to rely on the Waiver. While the district court held the Waiver was valid, it found the Waiver inapplicable because Doublet was a manufacturer under La. C.C art. 2545. Further, even if Doublet is not a manufacturer, the court found that he knew of the defects in the Property when he sold it. We do not find the district court's holdings in these instances clearly wrong or manifestly erroneous.[10]

---

[10] We also note that following the Riverside inspection, the Jaskots sent Doublet a Property Inspection Response that contained all the defects found during the inspection. Doublet's argument that these defects were unknown to him totally undermines his credibility.

*Damages*

Finally, Doublet contends that the Jaskots introduced insufficient evidence to support a reduction of the Property's purchase price, but if so, the reduction was excessive.

The Jaskots introduced two estimates for repairs to the property. The first, from Scairono, totaled in excessive of $100,000. The second, from Lassair, totaled $64,525. Based on its reasons for judgment, the district court carefully reviewed both estimates.

In *Billups v. Lyons,* 01-1654, pp. 11-12 (La.App. 4 Cir. 5/29/02), 821 So.2d 499, 506-07, we stated:

> "[A]s noted in the comments to La. C.C. art. 2541, the price reduction that may be demanded under La. C.C. art. 2541 is the difference between the sale price and the price that a reasonable buyer would have paid if he had known of the defects." *Capitol City Leasing Corp. v. Hill,* 404 So.2d 935 (La. 1981). One of the principal elements in formulating a price reduction of the purchase price is the cost of repairs. *Griffin v. Coleman Oldsmobile, Inc.*, 424 So.2d 1116 (La.App. 1 Cir. 1982). In sales of immovable property the amount to be awarded is the amount necessary to convert an unsound structure into a sound one. *Lemonier v. Coco,* 237 La. 760, 112 So.2d 436 (1959) *Id.* at pp. 4-5, 694 So.2d at 426.

While the cost of repairs is used in formulating the reduction of the sale price, a greater reduction is warranted when the defects are numerous and the repairs lengthy and frequent. "This is so because a forewarned buyer would not reasonably pay the full price, reduced only by the cost of the repairs, if he knew the extensive repairs of the defects would significantly curtail his use and cause him considerable inconvenience and aggravation." *Griffin*, 424 So.2d at 1118 (citing *Menville v. Stephens Chevrolet, Inc.,* 300 So.2d 858, 862 (La.App. 4th Cir. 1974)).

> To prove the theoretical price to which the actual sale price should be reduced, a plaintiff attempts to establish the fair value as of the time of the sale, if the defects had been known. Evidence as to this

theoretical value may consist of expert opinion testimony, of costs expended to place the thing in sound condition, or of other facts bearing on the reduced price a forewarned buyer would have paid and a seller with knowledge of the defects would have accepted. But in the final analysis the trier of fact cannot mathematically calculate what price the parties would have agreed to, if they had known of the defects; the trier must consider the overall evidence and, using limited discretion, must set a reduced sale price which fictionally represents the fair value at the time of sale.

*Menville,* 300 So.2d at 862.

To determine a reduction of the purchase price, the district court used individual figures from both estimates to arrive at a theoretical price to repair the defects in the Property:

> The Court was presented with two estimates for the repairs by the Jaskots' experts, which is permissible evidence for this Court to consider when determining the theoretical value for diminution. *See Chalmers v. Stephens Chevrolet, Inc.*, 461 So.2d 395, 399 (La. App. 4 Cir. 1984). Regarding the piers, Mr. Scairono suggested that the pier repairs would cost $25,000.00. Mr. Lassair estimated the costs of the repair to be $21,000.00. The Jaskots also obtained an estimate from Davey Shoring Co. in the amount of $18,700.00. The Jaskots testified that they do not trust this company because Mr. Doublet had done work for them in the past. The Court finds that Mr. Lassair's estimate is reasonable.

> Mr. Scairono's estimate to install uplift anchors or Simpson Straps is $15,000.00. As for the drainage around the foundation, Mr. Scairono's estimate is $15,000.00. Mr. Lassair's estimate is $4,500.00. Mr. Scairono testified that the floors would need to be removed and replaced to remedy the vapor barrier problem. However, Mr. Lassair did concede that spray foam insulation is a less costly option, assuming there is no moisture in the floor structure. Mr. Lassair provided an estimate for spray foam in the amount of $2,500.00. This Court finds that the floor does need to be removed in some areas to discern if there is moisture in the floor structure and as such, believes that the sum of $15,000.00 for the vapor barrier is reasonable. Mr. Scairono estimated the costs to repair the improper installation of the Hardie boards at $15,000.00. Mr. Lassair proposed removing sealant and painting at a cost of $6,800.00. Mr. Lassair's estimate for repairing the roofing issues is $1,200.00. Mr. Lassair's proposal called for repairing the stove vent and replacing the side flooring near the side door at a combined price of $1,025.00. The cost for the miscellaneous defects totals $5,000.00. This Court finds that a reasonable cost for repairing the defective conditions is $84,525.00.

18

"Damage awards are not disturbed on appellate review unless there is an abuse of discretion." *Urology Clinic of New Orleans, Inc. APMC v. United Fire and Cas. Co.,* 08-0444, p. 3 (La.App. 4 Cir. 9/10/08), 993 So.2d 803, 806 (citing *Overton v. Shell Oil Co.,* 05-1001, p. 21 (La.App. 4 Cir. 7/19/06), 937 So.2d 404, 417. "This is due to the factfinder's 'wide latitude' in awarding damages." *Id.*

The district court performed a careful analysis to arrive at the reduction of the purchase price. It was presented with two estimates, both of which the court found reasonable with regard to the needed repairs to the Property. We cannot say that the court abused its discretion by awarding $84,525 as a reasonable cost for repairing the defective conditions present in the Property at the time of sale. Therefore, we affirm the award of $84,525, as well as the district court's award of $15,000 for inconvenience and mental anguish and $35,000 in attorney's fees.[11]

**CONCLUSION**

Based on the foregoing, we affirm the judgment of the district court.

**AFFIRMED.**

---

[11] Doublet did not challenge these latter two awards.