KRISTIN USNER NORTON

VERSUS

TAYLOR MONTGOMERY NORTON

NO. 21-CA-212

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 802-741, DIVISION "C"
HONORABLE JUNE B. DARENSBURG, JUDGE PRESIDING

December 22, 2021

**SUSAN M. CHEHARDY**
**CHIEF JUDGE**

Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and Marc E. Johnson

<u>**AFFIRMED**</u>
**SMC**
**FHW**
**MEJ**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLANT,
KRISTIN USNER NORTON
 Phillip A. Wittmann
 Brooke C. Tigchelaar

DEFENDANT/APPELLEE,
TAYLOR MONTGOMERY NORTON
 In Proper Person

**CHEHARDY, C.J.**

In this domestic dispute, plaintiff, Kristin Usner Norton ("Kristin"), appeals the trial court's January 4, 2021 judgment in favor of defendant, Taylor Montgomery Norton ("Taylor"), granting him an immediate divorce pursuant to La. C.C. art. 103(4), having found that Kristin physically abused him during the marriage. For the following reasons, we affirm the trial court's judgment.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Kristin Norton and Taylor Norton were married on December 27, 2003, in New Orleans, Louisiana, and made their home in Jefferson Parish (Metairie). Four children were born of the marriage; namely, Taylor Montgomery Norton, II ("T2"), Graham Sidney Norton, Addison Eileen Norton, and Alexis Estelle Norton. On January 2, 2020, Kristin filed a petition for divorce and ancillary matters, requesting a no-fault divorce pursuant to La. C.C. art. 102, on the basis that she intended to live separate and apart from Taylor for the requisite amount of time (a period in excess of 365 days) before obtaining this divorce. Taylor filed an answer and reconventional demand on January 23, 2020, also seeking a divorce from Kristin under the provisions of La. C.C. art. 102. In their respective pleadings seeking a no-fault divorce, each party alleged that other spouse was guilty of fault in the breakup of the parties' marriage, yet neither party set forth the specific conduct constituting the other spouse's alleged fault.

On April 29, 2020, Taylor filed an amended and supplemental reconventional demand seeking an immediate divorce pursuant to La. C.C. art. 103(4), alleging that Kristin physically abused him during the marriage. In particular, Taylor identified two instances that occurred, one on September 24, 2019, and the other on December 24, 2019, where he claims he was physically abused by Kristin.

A hearing on the merits of Taylor's demand for a La. C.C. art. 103(4) divorce was held before the trial court on December 29, 2020. Three witnesses testified at the hearing: Troy Norton, Taylor Norton, and Kristin Norton.

### Testimony of Troy Norton

Troy Norton, Taylor's brother, testified that during the early hours of December 25, 2019, he received a call from Kristin wherein she told him that she and Taylor had gotten into an argument and she was afraid that Taylor was going to call the police. Kristin asked Troy if she could come to his house because she had nowhere else to go. According to Troy, when Kristin arrived at approximately 12:30 a.m., her intoxication "was very obvious," as she was "stumbling a little bit … and she was very emotional" and "mumbling her words." Troy explained that the extended family had gathered earlier that evening at his parents' home for a Christmas Eve celebration, where both Kristin and Taylor had been drinking.

Troy testified that Kristin remained at his home for approximately an hour and a half. While there, Kristin told Troy that she and Taylor had been arguing in front of the kids and that "she struck [Taylor]" after becoming angry at something he said. Kristin told him that after the argument, Taylor called the police, who were on their way to the Nortons' house, and she left because she did not want to get arrested. Troy testified that when it came time for Kristin to leave, he and his wife sent Kristin home in an Uber because they believed she was too intoxicated to drive. He later sent Kristin a text to make sure that she was all right. According to Troy, Kristin made no mention to him that Taylor had abused her in any way, that Taylor was the aggressor, that Taylor had attempted to have sex with her, or that Taylor had attempted to rape her in any fashion.

Troy testified that when he spoke to Taylor in the following days, he told Taylor about Kristin having admitted to him that she physically struck Taylor during the Christmas Eve argument. He stated that Taylor later showed him

photographs of his arms, which Troy testified showed scratches and claw marks consistent with the injuries Taylor had previously described as having been inflicted by Kristin during the argument. Troy stated that during previous discussions, Taylor told him about other instances where Kristin was intoxicated, an argument ensued, and Kristin had physically hit or slapped him. According to Troy, Kristin never attempted to defend her actions to him by stating that she was acting in self-defense or that she accidentally struck Taylor. To the contrary, Kristin specifically told Troy that she struck Taylor on "purpose because she was provoked by some of his words spoken [not by some physical action by Taylor] in front of the children."

Troy conceded on cross-examination that once Kristin filed for divorce in January 2020, he called her to tell her that he was sad that her marriage to Taylor was ending. He stated that over the past several years, he had observed Taylor and Kristin arguing more frequently and "when that happened it was usually as a result of their intoxication." He stated that on separate occasions, both Kristin and Taylor expressed concern to him about the other's drinking alcohol to excess. Troy stated that Taylor also conveyed to him his concern regarding Kristin's use of the drug, Lexapro, especially when she drank alcohol while also taking the drug.

Troy testified that while he never personally witnessed Kristin inflicting physical abuse upon Taylor, in addition to telling Troy about Kristin's physical abuse on Christmas Eve, Taylor did describe to him previous instances where he was physically abused by Kristin, which mostly occurred during arguments where Kristin was intoxicated. Troy also recalled that Taylor complained to him on multiple occasions that he was tired of Kristin physically abusing him and "behaving that way." Troy testified that, based on his prior discussions with Taylor, he believed that Kristin's use of Lexapro, Taylor's suspicion of Kristin's infidelity, and Kristin's physical abuse of Taylor when she was intoxicated, were

all "contributors" to Taylor's filing the amended and supplemental reconventional demand seeking a fault-based divorce from Kristin.

Regarding the alleged altercation that took place between Taylor and Kristin on September 24, 2019, Troy testified that he had no knowledge or recollection of the incident.

### *Testimony of Taylor Montgomery Norton*

At the hearing, Taylor explained that while he initially filed for a reconventional demand seeking a La. C.C. art. 102 divorce, because there was not going to be a reconciliation between the parties, he filed for the La. C.C. art. 103(4) divorce because he could obtain a divorce sooner. He testified that he was not going to return to a relationship where he was being physically abused, and that he wanted a divorce "sooner rather than later."

Taylor testified that Kristin physically abused him on multiple occasions during their marriage. He claimed that "[s]he had a tendency to become irate and [they] would get into word matches and whenever [Kristin] felt like she couldn't get her words to mend, then she would [physically] lash out" at him. According to Taylor, Kristin would typically claw at and/or slap his face and, occasionally, his arms. Kristin also often cursed at him, which only seemed to be getting progressively worse over time, particularly with her use of Lexapro. Taylor testified that he finally reached the point that he did not want Kristin to abuse him anymore, especially in front of the children. Taylor denied that he ever physically or verbally abused Kristin.

With regards to the final physical altercation between the parties that occurred on December 24, 2019, Taylor stated that he, Kristin, and the children had previously been at a Christmas Eve celebration at his parents' home. Although he had been drinking that evening, he did not believe he was intoxicated or even had a "buzz," but testified that Kristin was "on her way [to] being intoxicated"

because she was stumbling and slurring her speech. Taylor testified that they arrived home from the party between 11:00 and 11:30 p.m. After putting cookies and milk out for Santa, and putting the children to bed, he and Kristin went to their bedroom. He asked Kristin if she wanted to be intimate; she did not. According to Taylor, Kristin walked out of their bedroom into the boys' room, and crawled into bed with their eldest son, Taylor (also referred to as "T2"). Taylor claimed that when he was near the boys' room, he could hear Kristin talking negatively about him to T2, including telling T2 that Taylor was a horrible person. Taylor stated that he proceeded into the boys' room, and when he attempted to tell T2 to "relax [and] go to sleep" and that it was "all going to be okay," Kristin became irate and physically attacked him. Taylor explained that as he leaned into T2 and attempted to put his arm around him, Kristin "reach[ed] out [and] grab[bed his] face … with her claws …" She then dug her fingernails into his arms with such force that he could not pull his arms away. According to Taylor, Kristin grabbed and clawed him in front of T2, who was next to her on the top bunk, and Graham, who was in the bottom bunk. According to Taylor, when he was able, he backed away and told Kristin that he was "not taking this anymore."

Taylor testified that because Kristin was intoxicated and irate, and he believed things would only escalate if she did not calm down, he called the police thinking they would be able to stop her escalating erratic behavior. Once Taylor called the police, however, Kristin became even more irate, and left the house. Taylor explained that while he did make a police report, which was admitted into evidence for a limited purpose, he opted not to press charges against Kristin.

At the hearing, Taylor admitted into evidence photographs that he had taken with his iPhone on the morning of December 25, 2019, approximately eight hours after the altercation, which showed the "physical abuse inflicted upon [him] by Kristin." According to Taylor, the photographs showed the scratches or lacerations

and abrasions that Kristin inflicted upon his arms when she "gashed" him with her fingernails, "scratched [them] and then gripped in hard."

Taylor also testified regarding another incident that occurred on September 24, 2019, where Kristin physically abused him. According to Taylor, on that occasion Kristin arrived home intoxicated after spending several hours with colleagues at Clancy's restaurant and was "very belligerent" to him. Taylor stated that Kristin appeared to be "upset at the world" and provoked an argument with him in the presence of their four children, by slapping and clawing at his face with both hands. Taylor admitted that in order to remove Kristin's fingers from his face, he used both hands to pull her forearms away, and then he restrained her hands from continuing to attack his face and so that he could back away. Taylor denied that he physically held Kristin down or intentionally bruised her. Taylor denied that he threatened or provoked Kristin in any fashion before she attacked him. He explained that he did not take photographs on that occasion as he did not want to take a "selfie" of his face. He also did not call the police as he believed it would have upset the children even more. Taylor introduced into evidence at the hearing text messages exchanged between himself and Kristin on the day after the altercation, which he alleged corroborated his testimony of the incident.[1]

Taylor also testified that while he did not like the fact that Kristin took Lexapro, because he felt she would "lose a sense of love and feeling [and it] gave her sort of [a] mean demeanor," he especially did not like Kristin drinking alcohol while also taking Lexapro. On those occasions, Taylor described Kristin as becoming "mean and belligerent." He described Kristin as becoming "more irate" and "on edge" when she drank. According to Taylor, he noticed a progressive

---

[1] In the text messages, Taylor asked Kristin if she could assure him that she would not physically attack and claw his face in front of their children as it was unhealthy for them to see that. Without denying that she physically attacked and clawed Taylor's face, Kristin responded, "Please assure me you will not physically hold me down and give me bruises." Taylor replied, "I merely pried your hands off my face and then held them open so that you would not pull my face." He further said that he was truly sorry if she got bruised in that process and that he truly loved her. Kristin did not respond further.

change in Kristin over time, where she became erratic and would use curse words when talking to him and/or the children.

### *Testimony of Kristin Usner Norton*

Kristin testified that she filed for a La. C.C. art. 102 divorce because she was tired of being a "victim of narcissistic abuse" by Taylor.  She stated that whenever Taylor would not get his way, he would rage and devalue her with verbal and emotional abuse.  She testified that he exerted his power and control over her by forcing her to have sex against her will on a regular basis, and that this was a pattern of behavior that, by the end of their marriage, made her no longer feel safe in her own home.  She claimed she walked on eggshells and at night, when Taylor came home late and she heard the door beep, her anxiety rose because she knew that he was going to force sex upon her.  She stated that Taylor accused her of things that were not true—*i.e.*, infidelity, alcoholism, and that her use of Lexapro made her incapable of feeling or knowing how to love other people—and that he baited her—*i.e.*, telling her that he made more money than her brother, who happens to be a millionaire in Texas, and that she should "go back to the Westbank where she belongs."

Kristin described Taylor as a narcissist and one who "knows how to stay calm and collected," and claimed that he intimidated her.  According to Kristin, Taylor would come at her with words, and things would escalate to the point that she could not take it anymore, and her response "would not be nice."  Kristin denied that she was ever physically abusive of Taylor, as he is much larger than she is, and that Taylor never complained to her that she was physically abusive towards him.  Kristin testified that Taylor repeatedly accused her of infidelity to deflect his own indiscretions and affairs.  She claimed that it was Taylor's continued baseless allegations of her infidelity that led her to tell him that she was going to seek a divorce.  When Taylor realized that she was serious, Kristin

claimed that he threatened to financially destroy her and even threatened to go after her pharmacy license.

Kristin testified that on December 15, 2019, she went to Taylor's office and told him that she planned to file for divorce. Although he did try to dissuade her and recommended marriage counseling, Kristin told him that it was too late for that. Later, on December 24, 2019, after going to Christmas Eve Mass and enjoying family game night with their children, they went to Taylor's parents' home for a party, where "the alcohol was flowing."

Kristin testified that when they returned home from the party, Taylor went to bed and she stayed up reading a book to the children. After putting the girls to bed, Kristin claimed that she and the boys put out the Santa toys. When finished, she went to bed, and because she had already previously told Taylor on December 15 that she planned to file for divorce, she intended to go straight to sleep. However, when she got into bed, Taylor attempted to have sex with her against her will, and when she refused, Taylor went into a rage. Kristin testified that she felt like she had to escape him so she first went into the children's playroom and lied down on the couch. She claimed Taylor followed her and began to verbally attack her, so she went into her sons' room and climbed into T2's bunk, thinking Taylor would leave her alone. Kristin stated that Taylor followed her, however, and continued to verbally attack her accusing her of affairs in front of their son. Kristin testified that it was such a traumatic experience that the only thing she could think to do was to push Taylor's face away in order to get him to stop saying inappropriate things in front of their son.

At one point during her testimony, when asked directly by her counsel if she "clawed" Taylor, Kristin admitted that she did, but denied that he was bleeding in any way or that he sought medical attention:

> Q. … [D]id you claw him?

A.    Yes. …

Q.    I understand. Was he bleeding in any way?

A.    No.

Q.    And did he seek medical attention?

A.    No.

Later during her testimony, however, Kristin denied that she "clawed" Taylor, but claimed to have only attempted to push his face away. She also denied having caused any injury to his arms. Instead, Kristin stated that when she reached towards Taylor, he jumped back, "all cool, calm, and collected" and then he called the police on her saying, "I'm going to get you on domestic abuse." Kristin claimed this whole thing was a set-up by Taylor because he knew she planned on filing for divorce and he wanted leverage to file for divorce against her. No longer feeling safe in her own home "because of Taylor attacking" her, Kristin testified that she left the house and went to the home of Troy Norton, Taylor's brother.

Kristin testified that when she got to Troy's home, she explained to him what happened; in particular, that Taylor had been verbally abusive to her. She claimed that Troy's reaction was very supportive. Although Kristin admitted that she did not tell Troy that the reason Taylor had gotten mad in the first place was because she refused to have sex with him, "[b]ecause that's private information," she did tell Troy that she swung her arms to move Taylor away from her and her son. She denied ever having told Troy that she slapped or struck Taylor. Kristin also denied that she was intoxicated that night or that she took an Uber home from Troy's house because she was intoxicated. Kristin testified that she fled her house that night because she was scared for her safety, not because she had physically attacked Taylor or was running from the police. She claimed that instead of filing her own police report giving her side of the story, her response was to file for divorce as soon as she could, which she did only eight days later.

As to the September 24, 2019 incident, Kristin testified that she had attended a work dinner and, after arriving home at 10:00 p.m., she discovered the kids were just eating dinner and that they had not done their homework. She claimed she had learned that their seven-year-old twin daughters had been left alone because Taylor failed to come home from work on time before their sons had been picked up for soccer practice. Kristin stated that she also learned that Taylor had failed to pick up T2, and that he had to go home from practice with a "new stranger friend." She claimed that upon learning all of this, she became upset and went into their bedroom. Taylor followed her. Kristin admitted that, having had enough, she did use her hand and "pushed his face," but she denied that she "clawed" Taylor's face. Taylor then took her arms and pinned her wrists back onto the bed, restraining her, while she struggled and they continued to yell at one another. When he finally let her go, Kristin claimed that she told Taylor to get out of the house and to go to his mother's home [down the street]. According to Kristin, while the children could hear them arguing that night, contrary to Taylor's version of the incident, the argument occurred behind closed doors and not in front of the children. Kristin stated that her wrists were bruised and her chest was sore for days thereafter. She claimed that the following morning she also learned that Taylor had flushed her entire prescription for Lexapro down the toilet.

Despite having already testified that Taylor was not physically abusive towards her during the marriage (only verbally abusive and intimidating), Kristin stated that she recalled two specific instances where he had, in fact, been physically abusive. First, was the September 24, 2019 incident, where he pinned her down and bruised her wrists, and the second occurred in November 2015, while the family was at their home in Mississippi. According to Kristin, in front of the children, Taylor "literally held [her] and almost punched [her] …" and physically pushed her out of the house and locked the doors. She claimed the

children, who were inside and could see her through the windows out on the porch, were told by Taylor not to let her back in the house even though she was begging to get back in.

On cross-examination, Kristin conceded that she made no allegations of physical abuse by Taylor in any of the pleadings she filed, but claimed that she "chose the non-fault route cause [she] did not want to emotionally have to testify [sic] some of the horrific moments in [the] years of [her] life." She further conceded that despite having filed numerous exceptions and affirmative defenses to Taylor's reconventional demand, nowhere did she ever claim "provocation" or that she had acted in "self-defense." She explained that she chose not do so because she "did not want to file a fault divorce" and "was waiting to defend [her]self in trial."

Kristin testified that while Taylor "never cursed" her, he "has an art of how to verbally and emotionally devalue you [using] words without cursing." Kristin denied having ever intentionally physically attacked Taylor, much less attacked him in front of the children. She claimed that Taylor initially verbally attacked her and that she merely responded by pushing his face away. Kristin also testified that Taylor's alleged concern about her mixing alcohol and Lexapro is unfounded because "there is no drug interaction between alcohol and Lexapro." Moreover, despite her testimony of Taylor's various affairs, Kristin claimed that she did not have the money to hire a private investigator in order to prove the alleged affairs.

At the close of the hearing, the trial judge granted a divorce in favor of Taylor pursuant to La. C.C. art. 103(4) finding that Kristin physically abused him during the marriage. Specifically, in oral reasons, the trial court stated, in part:

> Alright. Let me start by saying neither of you I find is
> innocent in any of this. And I will say Ms. Norton I
> believe you when you say that Mr. Norton inflicted
> verbal abuse on you. I think you're being truthful about
> that. However, when someone puts verbal abuse on you

it does not give you the right to become physical with that person. Especially in front of the children. … So I understand why you left the home when he called the police. Because if you had not if you had been arrested he would have to report that arrest and when you renew your license. … But it does not give you the right to become physical. And that's when you know it's time to leave. When things become physical it is time to leave because the physical altercation[s] start and they get progressively worse. It appears that this is what happened. September it wasn't so bad. But came December things got a little worse. And so with that said I think there was a physical altercation. Definitely on the 24th of December and the 24th of September probably so. But I am convinced that there was something physical that went on. … So with that said, I'm going to grant the 103.4 divorce that was filed by Mr. Norton based on physical abuse that occurred during the marriage.

A written judgment to this affect was signed on January 4, 2021. It is from this judgment that Kristin timely filed the instant appeal.

## ASSIGNMENTS OF ERROR

Although Kristin sets forth two assignments of error in her brief on appeal, we find the sole issue for this Court's review is whether the trial court erred in its determination that Taylor proved by a preponderance of the evidence that Kristin physically abused him during the marriage entitling Taylor to an immediate judgment of divorce pursuant to La. C.C. art. 103(4). After a thorough review of the record in its entirety, we find no manifest error in the trial court's determination, nor that the trial court's judgment was legally wrong.

## STANDARD OF REVIEW

On appeal, we review the trial court's findings of fact under the manifest error standard. *Martin v. Trushyna*, 19-79 (La. App. 5 Cir. 11/13/19), 283 So.3d 1083, 1086. The trial judge is vested with great discretion in weighing the evidence and credibility. *Id*. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and

inferences are as reasonable. *Rosell v. ESCO*, 549 So.2d 840, 844-45 (La. 1989); *Dean v. Ramos Corp.*, 00-1621 (La. App. 5 Cir. 2/28/01), 781 So.2d 796, 803. The issue to be resolved is not whether the factfinder was right or wrong, but whether his conclusion was a reasonable one. *Stobart v. State through Dep't of Transp. & Dev.*, 617 So.2d 880, 882 (La. 1993). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Id.* To reverse a factfinder's determination, the appellate court must find from the record that a reasonable factual basis for the trial court's finding does not exist, and that the record establishes that the finding is clearly wrong. *Rabalais v. Nash*, 06-999 (La. 3/9/07), 952 So.2d 653, 657; *Martin*, 283 So.3d at 1086. Where the factfinder's determination is reasonable, in light of the record viewed in its entirety, the court of appeal may not reverse. Even where the court of appeal is convinced that it would have weighed the evidence differently to reach a different result. *Rabalais*, 952 So.2d at 657. The trial court sitting as the trier of fact is in the best position to evaluate the demeanor of the witnesses, and its credibility determinations will not be disturbed on appeal absent manifest error. *Pellerano v. Pellerano*, 17-302 (La. App. 1 Cir. 4/12/19), 275 So.3d 947, 950, *writ denied sub nom.*, *Acosta v. Perllerano*, 19-756 (La. 9/17/19), 279 So.3d 379. Thus, the trial court's findings of fact, including its assessment of the weight of the evidence, evaluation of the demeanor of the witnesses, and credibility determinations, may not be disturbed on appeal absent manifest error. *Aguillard v. Aguillard*, 19-757 (La. App. 3 Cir. 7/8/20), 304 So.3d 473, 484.

The manifest error standard of review also applies to mixed questions of law and fact. *Martin*, 283 So.3d at 1086; *A.S. v. D.S.*, 14-1098 (La. App. 4 Cir. 4/8/15), 165 So.3d 247, 254. When an issue is a strictly legal question, the *de novo* standard of review is used. *Id.*

**DISCUSSION**

A divorce shall be granted on the petition of a spouse upon proof that the other spouse has committed physical abuse during the marriage. La. C.C. art. 103(4).[2] The petitioning spouse bears the burden of proving his claims of physical abuse by a preponderance of the evidence. *See Tidwell v. Tidwell*, 49,512 (La. App. 2 Cir. 11/19/14), 152 So.3d 1045, 1047. A finding of fault is an issue that turns largely on evaluations of witness credibility. *Noto v. Noto*, 09-1100 (La. App. 5 Cir. 5/11/10), 41 So.3d 1175, 1179; *Schmitt v. Schmitt*, 09-415 (La. App. 4 Cir. 12/16/09), 28 So.3d 537, 540. A trial court's finding of fault in a domestic dispute is a factual determination subject to the manifest error standard of review. *Barnett v. Barnett*, 15-766 (La. App. 5 Cir. 5/26/16), 193 So.3d 460, 466, *writ denied*, 16-1205 (La. 10/10/16), 207 So.3d 406. The trial court's factual determination regarding physical abuse by one spouse upon the other is entitled to great weight on appeal and will not be disturbed unless manifest error is shown. *See McFall v. Armstrong*, 10-1041 (La. App. 5 Cir. 9/13/11), 75 So.3d 30, 35; *Dufresne v. Dufresne*, 08-215 (La. App. 5 Cir. 9/16/08), 992 So.2d 579, 586, *writ denied*, 08-2843 (La. 12/17/08), 996 So.2d 1123.

In the case *sub judice*, Kristin challenges the credibility determinations made by the trial court and alleges the trial court improperly determined, based on the evidence presented, that she physically abused Taylor during the marriage. Kristin maintains that the evidence Taylor presented did not rise to the level of physical

---

[2]     One of the main benefits of obtaining a fault-based divorce under La. C.C. art. 103(4) is that there is no waiting period; the divorce is immediate. 2015 La. Sess. Law Serv. Act 221 § 4. *Martin*, 283 So.3d at 1089. The second major benefit of a fault-based divorce is in the area of spousal support. A spouse who is awarded a fault-based divorce pursuant to La. C.C. art. 103(4) or (5), or is determined by the court to have been a victim of domestic abuse during the marriage is *presumed* to be entitled to final periodic spousal support. *Id.* at 1090; La. C.C. art. 112(C). Also, when support is awarded after a judgment of divorce based on domestic abuse, "the sum awarded may exceed one-third of the obligor's net income and may be awarded as a lump sum." La. C.C. art. 112(D). This is a benefit that is not available for other types of divorce. *Id.* Spousal support is not an issue in the instant case, however, as the parties stipulated that they have equal earning capacity.

abuse as that term is understood in Louisiana law and jurisprudence, but rather, the trial court relied solely on Taylor's self-serving testimony that she scratched him. Kristin contends the trial court, by determining that she physically abused Taylor, "expanded the definition of 'abuse' beyond what any other court has held to constitute physical abuse and how the Legislature has defined and applied that term." In short, according to Kristin, had the trial court applied the proper legal standard, she would have prevailed.

Louisiana Civil Code article 103(4) does not define "physical abuse," nor do the laws or jurisprudence addressing family violence or domestic abuse provide a concrete definition or what actions would constitute "physical abuse" for purposes of obtaining an immediate divorce pursuant to Article 103(4). Similarly, because the article is relatively new, there is scant jurisprudence that has directly addressed the evidence sufficient to support a finding of "physical abuse" in the context of an Article 103(4) divorce.[3]

Nonetheless, Kristin argues that physical abuse can serve as a grounds for fault for purposes of a fault-based divorce under Article 103, *only* if the fault consists of serious misconduct *and* was the cause of the breakup of the marriage. Specifically, Kristin contends that "although a single instance of physical abuse may be sufficient to constitute fault for purposes of separation (or divorce) in certain instances, this rule is inapplicable if there exists mutual fault by the parties or if the fault/abuse at issue is the result of provocation on the part of the other spouse." Consequently, Kristin avers the trial court erred as a matter of law and abused its discretion by finding that she was legally at fault in the breakup of the marriage because the single scratch that she *may* have inadvertently inflicted upon

---

[3]    In 2014, No. 316, § 1, La. C.C. art. 103 was amended and added subsection (4), which provided that "[t]he other spouse has physically or sexually abused the spouse seeking divorce or a child of one of the spouses, regardless of whether the other spouse was prosecuted for the act of abuse." In 2015, No. 221, § 1, La. C.C. art. 103(4) was again amended to add the language, "During the marriage, …"

Taylor—which was done in self-defense and in direct response to his verbal abuse, physical intimidation and provocative actions towards her—does not rise to the threshold level of physical abuse under La. C.C. art. 103(4). Additionally, Kristin argues that, because of the trial court's statement that neither party was "innocent in all of this"—which Kristin contends was tantamount to finding that the parties were mutually at fault in the breakup of the marriage—the trial court was precluded from granting a fault-based divorce in favor of Taylor.[4] We disagree.

The question of whether a single physical altercation between spouses rises to the level of physical abuse, which would warrant a fault-based judgment of divorce under La. C.C. art. 103(4), presents a mixed question of fact and law that is to be determined by the trier of fact. As previously noted, mixed questions of fact and law should be accorded great deference by appellate courts under the manifest error standard of review. *O'Hern v. Department of Police*, 13-1416 (La. 11/8/13), 131 So.3d 29, 33. Accordingly, as a mixed question of fact and law, a trial court's finding that a physical injury inflicted by one spouse upon the other rises to the level of physical abuse sufficient to warrant a fault-based divorce should be afforded great deference by a reviewing court.

Here, the trial court record clearly indicates that, while Taylor may have used provocative language, Kristin became increasingly physically abusive. Despite Kristin's suggestion to the contrary, it was not necessary in this case for the trial court to decide whether or not a criminal conviction or a domestic abuse prevention order for her physical abuse of Taylor could have been obtained. The trial court determined that, based on the evidence and testimony presented at the hearing—which established that the physical injuries Kristin inflicted upon Taylor

---

[4]     Although Troy Norton testified at trial that Kristin admitted to him that she struck Taylor's face during the Christmas Eve altercation, Kristin denied that she struck Taylor or inflicted scratches and abrasions on his arms. Moreover, despite having initially testified that she did, in fact, "claw" Taylor, she later changed her testimony and stated that she merely "pushed" him away from her in self-defense as she was afraid he might take aggressive actions against her.

amounted to more than the "single inadvertent scratch" she alleges herein—Taylor's physical injuries were significant and sufficient to prove that Kristin physically abused him during the marriage. Article 103(4) does not require that Taylor had to have sought medical attention for his injuries in order to have satisfied his burden of proving physical abuse. Moreover, based on the testimony of the witnesses, the trial court found that the physical altercations between the parties, and the physical actions taken by Kristin, appeared to be escalating in severity as the marital relationship deteriorated and the acrimony between the parties increased. We cannot say the trial court's finding of physical abuse was manifestly erroneous or clearly wrong.

To support her contention that the trial judge's purported finding that both Kristin and Taylor were "mutually at fault" in the breakup of the marriage precluding the granting of a fault-based divorce in favor of Taylor, Kristin relies on *Caldwell v. Caldwell*, 95-963 (La. App. 5 Cir. 3/13/96), 672 So.2d 944, 946 and *Lyons v. Lyons*, 33,237 (La. App.2 Cir. 10/10/00), 768 So.2d 853, 860. Kristin's reliance on these cases, however, is misplaced as they are factually distinguishable from the instant case. In both *Caldwell* and *Lyons*, at issue was not whether the husband was legally entitled to the *divorce*, but rather, whether the wife's fault in the breakup of the marriage precluded her from receiving permanent *spousal support*. In the case *sub judice*, spousal support, where the "mutual fault" of the parties may be relevant, was not at issue; the sole issue before the trial court was whether Taylor was legally entitled to an immediate divorce based on Kristin's physical abuse of him during the marriage.

While the statutory law does not specify what grounds constitute fault so as to bar an award of final periodic spousal support, the statutory law *does* specify what grounds constitute fault for purposes of obtaining an immediate divorce. Specifically, La. C.C. art. 103 currently entitles a spouse to seek a fault-based

divorce on the basis of the other spouse's adultery, conviction of a felony with a sentence of death or imprisonment at hard labor, the physical or sexual abuse of the spouse seeking a divorce (or a child of one of the spouses) during the marriage, or the issuance of a protective order during the marriage against the other spouse to protect the spouse seeking the divorce (or a child of one of the spouses) from abuse. *Barnett*, 193 So.3d at 466. Conversely, in the context of periodic spousal support, the jurisprudence has found the necessary conduct constituting "fault" not only to include the fault grounds which currently entitle a spouse to a divorce under La. C.C. art. 103, but also the fault grounds which previously entitled a spouse to a separation under La. C.C. art. 138. *Barnett*, 193 So.3d at 466. Prior to its repeal, Article 138 provided the grounds for separation, which included adultery, habitual intemperance, excesses, cruel treatment or outrages, making living together unsupportable, and abandonment. *Id.* The jurisprudence has further broadened what constitutes "fault," which would preclude spousal support, beyond the fault grounds set forth in Article 103 and former Article 138, to also include other conduct or substantial acts of commission or omission by a spouse violative of his or her marital duties or responsibilities. *Id.* In short, while habitual intemperance, excesses, cruel treatment or outrages, abandonment, or substantial acts of commission or omission by a spouse violative of his or her marital duties or responsibilities *could* constitute fault in the context of final periodic spousal support, such conduct or actions *would not* constitute fault for purposes of a spouse's entitlement to an immediate divorce pursuant to La. C.C. art. 103. *Thomas v. Thomas*, 17-760 (La. App. 4 Cir. 2/21/18), 238 So.3d 515, 518.

Additionally, although Kristin contends the evidence at trial established the parties were "mutually at fault" for the breakup of the marriage, Taylor's "fault" was not at issue in the divorce proceeding below. Even considering the trial court's statement in oral reasons that neither party was "innocent in all of this," the

evidence of Taylor's alleged fault in verbally and emotionally abusing Kristin and/or intimidating her during the marriage does not constitute grounds—or fault—for divorce under La. C.C. art. 103. Moreover, despite Kristin's testimony that Taylor physically abused her during the marriage, which would arguably constitute grounds for divorce, she did not allege physical abuse in any of her pleadings, and the testimony regarding the issue was conflicting. Additionally, even though freedom from fault is a prerequisite to a spouse's claim for final periodic support, we have found no corresponding statutory or jurisprudential rule that requires a spouse's freedom from fault in order to obtain an Article 103 divorce. *See* La. C.C. art. 112; *Smith v. Smith*, 08-575 (La. App. 5 Cir. 1/12/10), 31 So.3d 453, 462. To the contrary, a trial court may render a judgment of divorce notwithstanding the mutual fault of the parties as long as the judgment of divorce is based on one of the grounds set forth in La. C.C. art. 102 or La. C.C. art. 103. *See Harrison v. Harrison*, 503 So.2d 116, 119-20 (La. App. 5th Cir. 1987), *writ denied*, 503 So.2d 1017 (La. 1987).

In short, we find no merit to Kristin's contention that the spouse seeking a divorce under La. C.C. art. 103(4), after proving by a preponderance of the evidence that he or she was physically abused by the other spouse during the marriage, is precluded from obtaining a fault-based divorce because he or she may also bear responsibility, or be "mutually at fault," in the breakup of the marriage. Similarly, even though a spouse will not be denied final periodic support if his or her actions were considered reasonable or a justifiable response to the other spouse's provocative acts, there is nothing in La. C.C. art. 103 or the jurisprudence to suggest that these are matters for consideration when determining whether a spouse is entitled to a fault-based divorce. *See Smith*, 31 So.3d at 464.

Kristin next argues the trial court erred in granting Taylor a fault-based divorce based on physical abuse because her conduct was "justifiable as self-

defense and reasonable under the circumstances," and that she was acting out of a reasonable fear of her safety. We find that Kristin waived her right to raise this defense by her failure to plead it in her answer to Taylor's supplemental and amended reconventional demand for divorce under La. C.C. art. 103(4) or to include it in the affirmative defenses that she filed. La. C.C.P. art. 1003 provides that the answer "shall set forth all affirmative defenses as required by Article 1005." La. C.C.P. art. 1005 provides, in pertinent part:

> The answer shall set forth affirmatively negligence, or fault of the plaintiff and others, duress, error or mistake, estoppel, extinguishment of the obligation in any manner, failure of consideration, fraud, illegality, injury by fellow servant, *and any other matter constituting an affirmative defense*. [Emphasis added.]

An "affirmative defense" is one which will have the effect of defeating the suit on the merits. *Abadie v. Markey*, 97-684 (La. App. 5 Cir. 3/11/98), 710 So.2d 327, 332. La. C.C.P. art. 1005 requires that the answer set forth matters constituting an affirmative defense. Louisiana courts have liberally construed Article 1005, however, when a party fails to plead an affirmative defense, no proof can be offered at trial in support of the defense. *Perfection Metal & Supply Co. v. Independent Supply of N.O., Inc.*, 97-800 (La. App. 5 Cir. 1/14/98), 707 So.2d 86, 90. Generally, such a defense must be specifically pleaded or it is waived. *Allvend, Inc. v. Payphone Commissions Co., Inc.*, 00-661 (La. App. 4 Cir. 5/23/01), 804 So.2d 27, 30. The purpose of pleading a special defense is to give fair and adequate notice of the nature of the defense in order to prevent surprise. *Abadie*, 710 So.2d at 332. The party pleading an affirmative defense has the burden of proving it by a preponderance of the evidence. *Reily Elec. Supply, Inc. v. Hollenberg*, 535 So.2d 1321, 1323 (La. App. 5th Cir. 1988).

The affirmative defenses listed in La. C.C.P. art. 1005 are merely illustrative and not exclusive. *Abadie*, 710 So.2d at 332; *Webster v. Rushing*, 316 So.2d 111

(La. 1975). Although self-defense is not included in the illustrative list of affirmative defenses in Article 1005, "self-defense is clearly an affirmative defense" under the provision in the article, "any other matter constituting an affirmative defense."[5] *See Barnes v. Wilhite*, 434 So.2d 638 (La. App. 3d Cir. 1983), *writ denied*, 440 So.2d 148 (La. 1983); *see also Albarado v. Abadie*, 97-478 (La. App. 5 Cir. 11/12/97), 703 So.2d 736, 742, *writ denied*, 97-3081 (La. 2/13/98), 709 So.2d 756. Thus, as an affirmative defense, Kristin was required to specifically plead "self-defense." A review of Kristin's "Exceptions, Affirmative Defenses, and Answer to [Taylor's] Original and Amended and Supplemental Reconventional Demand for Divorce" shows that Kristin did not assert self-defense. Furthermore, the record does not include any requests by Kristin to amend her pleadings to assert self-defense as an affirmative defense. While Kristin did allege in her petition for a no-fault pursuant to La. C.C. art. 102 that Taylor was "guilty of fault" in the breakup of the marriage, we find that this does not meet the requirement of affirmatively pleading the defense of self-defense. The record shows that the first time Kristin asserted that her physical conduct towards Taylor was "justifiable as self-defense and reasonable under the circumstances" was at trial. Consequently, we find that Kristin waived the affirmative defense of "self-defense" by failing to properly plead it.

Moreover, as previously stated, the party raising an affirmative defense, such as "self-defense," has the burden of proving it by a preponderance of the evidence. The transcript shows that the trial judge liberally allowed Kristin to testify at the hearing regarding her fear of Taylor, and how her physical actions were in direct response to his verbal abuse, physical intimidation, and provocative actions towards her on Christmas Eve, and on other occasions during the marriage. Even

---

[5] In *Clark v. State, Depart. of Public Saf. and Corr.*, 03-455 (La. App. 5 Cir. 11/12/03), 861 So.2d 603, 612 (citing *Landry v. Bellanger*, 02-1443 (La. 5/20/03), 851 So.2d 943, 954-55), the court held that "[s]elf-defense … is a true defense in that it operates as a privilege to committing the intentional tort."

though such evidence could and should have been excluded, the trial judge clearly gave Kristin every benefit of the doubt. Nonetheless, the trial judge apparently did not find her testimony in this regard to be credible, or conversely, found Taylor's testimony to be more credible or compelling. After reviewing the testimony and the evidence, we find no manifest error in the trial court's factual finding.

In conclusion, after evaluating the conflicting testimony and credibility of the witnesses, and considering the other corroborating evidence introduced at the hearing, the trial court determined that Taylor had satisfied his burden of proving that Kristin physically abused him during the marriage by a preponderance of the evidence. We do not find manifest error in the trial court's assessment of the weight of the evidence, its evaluations of the witnesses' demeanor, or its credibility determinations. *See Martin*, 283 So.3d at 2086. We find a reasonable factual basis exists for the trial court's determination that Taylor's allegations of physical abuse by Kristin was credible. Contrary to Kristin's assertion that the trial court relied solely on Taylor's self-serving testimony, the trial court was presented with photographs that were consistent with Taylor's description of the scratches and abrasions he received to his arms on December 24, 2019, during the altercation with Kristin. The trial court was also presented with the testimony of Troy Norton, who did not actually see the altercation, but who testified that Kristin admitted to him after arriving at his home that she had struck Taylor. Additionally, the trial court was presented with the police report Taylor filed Christmas Eve night, which corroborated his testimony that he called the police after the altercation wherein he claimed that Kristin physically injured him. Accordingly, on review of the record in its entirety, we cannot say the trial court's factual findings, or its legal conclusion as applied to those facts, were manifestly erroneous or legally wrong.

## <u>DECREE</u>

For the foregoing reasons, we affirm the trial court's judgment granting an immediate divorce pursuant to La. C.C. art. 103(4) in favor of Taylor Montgomery Norton.

21-CA-212                                          **AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 22, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 21-CA-212

**E-NOTIFIED**

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE JUNE B. DARENSBURG (DISTRICT JUDGE)
BROOKE C. TIGCHELAAR (APPELLANT)        PHILLIP A. WITTMANN (APPELLANT)

**MAILED**

TAYLOR M. NORTON  (APPELLEE)
345 METAIRIE ROAD
METAIRIE, LA 70005

DAVID M. PRADOS (APPELLEE)
ATTORNEY AT LAW
701 POYDRAS STREET
SUITE 3600
NEW ORLEANS, LA 70139